## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Greg Holaway, individually and on behalf
of other similarly situated individuals,              Court File No.: 12-cv-00998 (PAM/JSM)

                              Plaintiff,

                                                      **MEMORANDUM OF LAW IN**
v.                                                    **SUPPORT OF DEFENDANT'S MOTION**
                                                      **FOR DECERTIFICATION OF FLSA**
Stratasys, Inc.,                                      **COLLECTIVE ACTION**

                              Defendant.

The Defendant, Stratasys, Inc. ("Stratasys"), respectfully submits this Memorandum of Law in Support of Defendant's Motion for Decertification of FLSA Collective Action ("Motion"). The named plaintiff and opt-in plaintiffs (collectively, "Plaintiffs") are all current or former Stratasys Field Service Engineers ("FSE") who allege that Stratasys violated the overtime provisions of the Fair Labor Standards Act ("FLSA") by misclassifying them as exempt employees.

Unlike a pattern and practice of not allowing individuals who punch a time clock to punch out for a 30 minute lunch break, misclassification allegations are highly fact intensive and individual claims, especially so since rarely the individual has actual time records. Thus, the determination of one individual as exempt or non-exempt cannot determine the status of another. Accordingly, each individual's daily activities must be considered and thus not only is there is no benefit to a collective action, but to proceed

collectively will be cumbersome, confusing, and unjust.   Respectfully, the collective action should be decertified and Stratasys' Motion granted.

## I.    STATEMENT OF FACTS

### A.    PROCEDURAL HISTORY

1.    On April 23, 2012, Greg Holaway ("Holaway") filed the Complaint alleging that he and other FSEs were misclassified as exempt employees and denied overtime wages.  [Collective Action Complaint, Docket No. 1 ("Complaint")].

2.    On August 23, 2012, Charles Longlois ("Longlois") opted-in.  (Docket No. 29).

3.    On October 30, 2012, the Court conditionally certified the collective action. (Docket No. 72).

4.    On November 15, 2012, the Court facilitated judicial notice of the conditional certification.  (Docket No. 75).

5.    On December 27, 2012, Duane Schwarze ("Schwarze") opted-in. (Docket No. 78).

6.    Longlois and Schwarze are the only opt-in plaintiffs.  (Docket No. 29, 78).

### B.    STRATASYS' BACKGROUND.

### Stratasys is a World Leader in 3D Additive Manufacturing.[1]

7.    As set forth more fully in Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Conditional Certification and Collective Notice, and

_____

[1] Additive manufacturing technology is commonly referred to as "rapid prototyping" or "3D printing".

2

incorporated herein by reference, Stratasys is a world leader in 3D additive manufacturing, using robotics to melt materials and extrude three-dimensional ("3D") products.  (Docket No. 50 at pp. 4-5); (February 20, 2013 Deposition of Duane Schwarze ("Sch. Feb. Dep.") attached to August 28, 2013 Affidavit of Corie J. Tarara ("Tarara Aff.") ¶ 2, Ex. A at 83:24-84:9; 85:2-17).

8.      Stratasys' 3D printers are used to make everything from toy parts to submarines or prototypes of them.  (Sch. Feb. Dep. 87:19-23).

9.      During the relevant time frame, Stratasys employed eighteen FSEs, who either reported to Roger King ("King"), Field Service Manager, or then-Field Service Supervisor, Vanessa Hodges ("Hodges").  (Docket No. 50 at pp. 5-7).

**Stratasys Utilizes Various Administrative Tools.**

10.      Stratasys uses a computer program called SalesForce as its main customer database.  (August 23, 2012 Deposition of Roger King ("King Dep.") attached to Tarara Aff. ¶ 3, Ex. B at 21:5-10).[2]  If a customer needs a FSE on site, the Field Service Manager opens a "case", assigns it to a FSE, which is then populated to the FSEs Outlook calendar and an automatic email is sent to the FSE and customer to alert them that the case has been scheduled with that FSE.  (King Dep. 87:5-88:6; 92:1-9; 92:22-23).

11.      During the relevant timeframe, Stratasys used Whitespace, a resource scheduling software program.  (King Dep. 88:7-14).   Whitespace was used by King and Hodges to track the FSEs in the field.  (King Dep. 90:12-21).   Once King or Hodges

_____

[2] SalesForce replaced Customer Service Field Reports, a single page form filled out by the FSE on-site.  (King Dep. 183:22-184:21).

assigned a FSE a case through SalesForce, it would automatically populate onto Whitespace and also the FSEs Outlook calendar at the same time.  (King Dep. 91:3-10; 92:10-18).

12.      Stratasys uses Wells Fargo's for FSE expense reimbursements.  (August 15, 2012 Deposition of Greg Holaway ("Hol. Aug. Dep.") attached to Tarara Aff. ¶ 5, Ex. D at 121:1-10); (February 18, 2013 Deposition of Charles Longlois ("Long. Dep.") attached to Tarara Aff. ¶ 6, Ex. E at 167:23-25).  FSEs must submit expenses through Wells Fargo's on-line program.  (March 6, 2013 Deposition of Greg Holaway ("Hol. March Dep.") attached to Tarara Aff. ¶ 7, Ex. F at 41:12-42:23).

### Stratasys' FSEs Arrange Their Own Travel.

13.      There is no procedure that FSEs must follow once a case is assigned through SalesForce; they are just "expected to take care of their customers" and get the information needed before visiting the customer.  (King Dep. 95:19-97:7).

14.      FSEs handle their own travel arrangements and can use a travel agency. (Hol. Aug. Dep. 209:2-210:15).

## C.    PLAINTIFFS' DIFFERENT BACKGROUNDS.[3]

### Plaintiffs Had Different Work Tenure and Compensation.

15.      Holaway worked for Stratasys from November 6, 2006 to February 15, 2012.  (Hol. Aug. Dep. 15:1-23; Docket No. 132-1).  As of January 2012, his weekly salary was $958.92 ($49,863.84 annually).[4]  (Docket No. 132-2, Attachment A).

---

[3] For purposes of the Motion only, Plaintiffs' "facts" are taken as true.

16.     Longlois worked for Stratasys from 1997 to 2000, as its first remotely-based FSE.  (Long. Dep. 27:14-28:1).  In 2000, Longlois resigned from Stratasys to earn more money.  (Long. Dep. 31:3-6).  In 2007, Longlois returned to Stratasys as a FSE and currently works out of his Ravena, New York home.  (Long. Dep. 14:15-21; 32:4-5).  As of January 2012, Longlois' weekly salary was $1,178.28 ($61,280.96 annually).  (Long. Dep. 198:21-201:8, Ex. 8).  Yet Longlois' damage analysis claims his January 2012 weekly regular rate was $1,236.00 ($64,272.00 annually).   (Docket No. 132-2, Attachment A).  Unlike Holaway and Schwarze, Longlois seeks to have his car allowance counted as wages for purposes of his regular rate.  Id.

17.     Schwarze worked for Stratasys as a FSE from August 1997 until his retirement in January 2012.  (Sch. Feb. Dep. 12:20-13:11).  As of January 2012, Schwarze's weekly salary was $1,178.54 ($61,284.08 annually).  (Docket No. 132-3, Attachment A).

**Plaintiffs Have Different Educational and Technical Backgrounds.**

18.     Holaway received a two year Electronic Technology Certificate in 1976. (Hol. Aug. Dep. 9:13-25).

19.     Longlois received vocational training in Electricity-Electronics in 1983, an Associate Degree in Applied Science in Avionics Systems Technology in 1993, and a bachelor's degree in Human Resources Administration in 1994.  (Long. Dep. 24:21-25:3;

---

[4] Holaway's background, daily activities, and methods of work are more fully set forth at Docket No. 50, pp. 7-11 and incorporated herein by reference.

Tarara Aff. ¶ 8, Ex. G).  In 2001, Longlois took classes toward a Master's of Science in Information Systems.  (Long. Dep. 25:4-11).

20.    Schwarze graduated from Brown Institute with a two-year Computer Electronics degree sometime after the early 1960s.  (Sch. Feb. Dep. 11:3-14; 12:2-11). He also took a few Electrical Engineering college classes.  (Sch. Feb. Dep. 11:18-24).

### **Plaintiffs Had Different Supervisors and Different Reporting Methods.**

21.    Holaway reported to King and rarely dealt with anyone else at Stratasys. (Hol. Aug. Dep. 136:13-137:1; 243:2-244:25).  King would tell Holaway what client he would need to visit through populating an Outlook calendar event.  (Hol. Aug. Dep. 77:3-8).  Holaway would email King when he was leaving his home and provide an estimated time of arrival at the client's location.  (Hol. Aug. Dep. 40:13-24).  Holaway did not email King once he actually arrived at the client's location.  (Hol. Aug. Dep. 40:13-17).

22.    Longlois trained Venessa Hodges (his current supervisor) and another individual when he was employed by Stratasys from 1997-2000.  (Long. Dep. 30:3-14; 35:22-24).  Prior to January 2013, Longlois received his assignments through Outlook. (Long. Dep. 74:21-77:14).  Prior to January 2013, Longlois would send four emails a day to "FDM dispatch" (King and Hodges) stating when he left his house, when he arrived at the customer's, when he left the customer's and when he arrived at the hotel.  (Long. Dep. 98:6-22).

23.    Schwarze reported to King.  (Sch. Feb. Dep. 14:10-12).  Schwarze did not use his Outlook calendar but relied on King to call him to tell him where he needed to go.

(Sch. Feb. Dep. 23:15-25; 51:5-17).  Schwarze would call King to let him know when he started and when he left.  (Sch. Feb. Dep. 67:2-19).

**Plaintiffs Worked At Different Locations and Their Methods of Travel Were Dissimilar.**

24.     Holaway performed work in over 22 states out of his Burnsville, Minnesota home office.  (Hol. Aug. Dep. 23:5-8; 25:12-20; 69:4-6).  He split his travel time equally between driving and flying, and made the decision depending on the distance from home.  (Hol. Aug. Dep. 39:11-18; 193:25-194:2; Ex. 1).  His typical trip involved an overnight stay.  (Hol. Aug. Dep. 68:23-69:6).

25.     Longlois' territory is "everything New York State north and east including Canada."  (Long. Dep. 37:8-17).  He is based out of his Ravena, New York home.  (Long. Dep. 14:15-21; 39:13-16).  Longlois drives to about 90% of his customers, takes the train about 5% and flies about 5% of the time.  (Long. Dep. 80:18-82:9; 120:7-17; 122:1-14).  The Albany, New York Airport is the closest airport to his home in Ravena and thus typically requires a layover.  (Long. Dep. 120:16-17; 122:1-14).  Longlois spends approximately 3-4 nights per week in hotels.  (Long. Dep. 84:2-6).

26.     Schwarze was a "floater" (with no territory) who worked out of his Blaine, Minnesota home.  (Sch. Feb. Dep. 45:6-22).  He traveled by car or plane to wherever he was needed nationwide (at least 40 states) and Canada.  (Sch. Feb. Dep. 20:12-12; 79:20-80:8; 112:12-14).  He flew more than Holaway and Longlois and "envied them" because they could drive home if they finished by 5:00, whereas he "only got to sleep in [his] bed

about three and a half nights a week". (Sch. Feb. Dep. 69:5-19). Schwarze is unable to recall or provide an average amount of hours that he spent traveling. (Sch. Feb. Dep. 79:16-19). Schwarze took a lot of Monday morning 7 a.m. flights out of the Minneapolis-St. Paul Airport. (Sch. Feb. Dep. 103:4-6). He testified that the other FSEs "got to spend more time at home" as they had a territory. (Sch. Feb. Dep. 109:8-14).

**Plaintiffs' General Job Duties Were Different.**

27.  Holaway's job duties are set forth at Docket No. 50, pp. 7-11 and incorporated herein by reference.

28.  Longlois considers himself an "expert" and his customers call him the "field service superhero". (Long. Dep. 24:24-25:6). Longlois describes his duties and responsibilities to: "install, repair, maintain all of our products in the field at customer's locations, train customers on how to properly operate the equipment, basic instruction on software so that they can produce parts and familiarize customers with the customer side routine maintenance." (Long. Dep. 39:17-40:4). He makes adjustments to controller software such as changing the "origin, the tip wipe location, calibration location, linear compensation variables". (Long. Dep. 55:6-18). Longlois spends 90% of his time on repairs and maintenance issues and 10% on new installations. (Long. Dep. 67:16-68:11). Training customers may take from two hours to two days. (Long. Dep. 44:9-22). Longlois keeps "random spare parts" in his car trunk such as T-class x motor, t-class y motor, fans, DC power supplies, z motion, nylon tubing, FCO kit and vacuum generators. (Long. Dep. 119:16-120:6; 164:18-21). Stratasys does not require Longlois to carry

spare parts, but he does so because "[i]t's nice to have them".  (Long. Dep. 120:7-15).

Longlois typically visits four customer sites per week.  (Long. Dep. 125:17-20).

29.     Schwarze did not install any new printers in the last two years of his employment (2010-2011).  (Sch. Feb. Dep. 22:12-25).  He has no idea how much time he spent on emergency maintenance versus preventative maintenance.  (Sch. Feb. Dep. 23:5-14).  The printers have changed over time, so now FSEs have to "figure out what's really wrong".  (Sch. Feb. Dep. 26:1-13; 27:10-28:10).  Schwarze would arrive at a broken machine and use his experience and "logical troubleshooting" to fix it.  (Sch. Feb. Dep. 38:16-22).  Schwarze did not carry spare parts with him when he traveled, except small things like little proximity sensors.  (Sch. Feb. Dep. 55:9-21; 56:4-6).  Schwarze did not train customers.  (Sch. Feb. Dep. 79:3-15).  Schwarze would go into other FSE's territories to repair what they could not, or if they did not have the time.  (Sch. Feb. Dep. 115:14-20).

### Plaintiffs Maintained and Installed the 3D Printers Differently.

30.     Some of Stratasys' 3D printers use different technology: the design, sensors, servo motors, on-board computers, vacuum pressure, computer controlled temperature, and computer software.  (Sch. Feb. Dep. 16:2-11;17:18-19:25).

31.     Holaway was trained on Stratasys' Maxum, Titan, Prodigy and Fortus (360, 400, 900) three-dimensional printers; he was not trained on (and thus did not install/repair/maintain) earlier machines.  (Hol. Aug. Dep. 20:5-22:5; 94:3-11).

32.    Longlois has been trained on every three-dimensional printer that Stratasys has made: FTM (1500, 1600, 1650, 2000, 8000); Quantum (now called the Maxum); Genesis; T-Class (Titan); P-Class (Prodigy); and Fortus (360, 400, 900) (Stratasys' largest printer).  (Long. Dep. 29:19-21; 38:5-39:4; 40:19-22; 57:1-9).

33.    Schwarze was trained on the FTM (1550, 1600, 1650, 2000, 3000), Maxum, Genesis, Prodigy, Prodigy Plus, T-class, 360, and 400.  (Sch. Feb. Dep. 15:20-16:1; 29:18-30:5).  He was not trained on the newest product, the 900 as he was going to retire.  (Sch. Feb. Dep. 15:24-16:1).

**Plaintiffs Took Different Amounts of Time to Perform Administrative Tasks.**

34.    Holaway spent approximately 30-60 minutes reviewing a customer file prior to a visit.  (Hol. Aug. Dep. 81:4-10).  Holaway would spend 6-8 hours per month working on expense reports.  (Hol. Aug. Dep. 124:23-125:2).  Holaway spent 30-60 minutes to enter a single customer's information into SalesForce, which added up to four or five hours per week.  [Hol. Aug. Dep. 81:4-10, 206:2-9].  Holaway spent 10-12 hours each week working on all the combined "administrative tasks".  (Hol. Aug. Dep. 143:12-23).

35.    Longlois spends approximately 30-45 minutes reviewing a customer's file prior to a visit.  (Long. Dep. 84:20-23).  Longlois spent about one hour preparing for each trip ("at least" a total of 4-6 hours per week).  (Long. Dep. 85:11-18; 126:11-21).  He "typically" uses time during the day that he is not scheduled for a project to "do other things if I need to, such as expense reports, review case notes, look at schedules, look at

10

what's coming up after…some [Total Training Network] stuff". (Long. Dep. 110:10-111:2). Longlois spends about "15 hours at least" each week doing post-trip administrative work. (Long. Dep. 125:9-16). Longlois testified that 15-25% of his time during a typical workweek is spent on administrative "paperwork". (Long. Dep. 151:4-7).

36.   Schwarze has no idea how long he typically spent inputting customer information into the software. (Sch. Feb. Dep. 24:1-23). Schwarze had no "average trip" and is unable to approximate how long it would take him to prepare to visit a customer. (Sch. Feb. Dep. 25:9-25). Schwarze worked on his expense reports "[e]very night". (Sch. Feb. Dep. 49:4-6). Schwarze "tried to keep [his] weekends sacred" and the "only thing [he] would do is paperwork"; he has no idea how many hours or minutes he spent doing paperwork on the weekends as it varied and would just be a guess. (Sch. Feb. Dep. 64:5-65:2). Schwarze does not even remember the name "SalesForce". (Sch. Feb. Dep. 118:18-22). Schwarze typically did his paperwork in the field, early in the morning on a work day and found that 6 am was a good time to do his expense reports, however, he would also do it back at the hotel before dinner. (Sch. Feb. Dep. 71:16-72:4).

**Plaintiffs Used Checklists, Manuals & Other FSEs Differently In Performing Their Job Duties.**

37.   Holaway worked alone and did not contact other FSEs for help or guidance. (Hol. Aug. Dep. 29:7-15). He did not always follow a checklist; when installing a new printer, after five years, he knew the installation checklist and just used it at the end to

11

verify that he did everything.  (Hol. Aug. Dep. 48:13-25; 232:16-233:19).  Although he

used his creativity in performing maintenance, at the end of his job, he would have to

make sure he did everything on the checklist.  (Hol. Aug. Dep. 234:5-235:25).  He

compares himself to a doctor when diagnosing a broken printer:

> A.  Some break more than others.  You have to look at the symptoms.
> Q.  How many symptoms can there be?
> A.  Thousands.  It's endless.  It's like your body.  How many things can go
> wrong in there and how do you fix them?

(Hol. Aug. Dep. 75:17-22).

38.  Longlois does not interact with other FSEs at Stratasys.  (Long. Dep. 36:20-

37:1).  Longlois uses a checklist for installations and preventative maintenance, but "not

so much" for repairs as "[y]ou have to go by the symptom and then narrow it down to the

area you need to investigate".  (Long. Dep. 154:13-156:21).  He is "pretty much" out

there all on his own.  (Long. Dep. 107:18-19).  Longlois has never made his own

checklist.  (Long. Dep. 116:18-20).

39.  Schwarze would discuss problems with King and other FSEs and would use

"all the people" he could to solve a problem.  (Sch. Feb. Dep. 39:6-13).  On one occasion,

Schwarze had another FSE come to a site to help him figure out the problem with the

printer.  (Sch. Feb. Dep. 31:11-18).  Likewise, Schwarze would help other FSEs.  (Sch.

Feb. Dep. 40:23-41:18).  Schwarze did not follow a checklist for emergency repairs, but

did for preventative maintenance.  (Sch. Feb. Dep. 37:7-38:15).  Schwarze used the

service manuals "quite often" for the schematics, clearances, calibration and adjustment

parameters.  (Sch. Feb. Dep. 44:3-19).  While there were some replacement procedures in the service manuals, given his experience, he did not use them, except to get part numbers for ordering parts. (Sch. Feb. Dep. 44:20-45:5).  Earlier machines had printed manuals available, but he could not carry those with him.  (Sch. Feb. Dep. 52:12-19).  Schwarze attributed his work to experience and logic:

> Q.  Did you consult any manuals when [the client] was describing or when he would describe that process?
> A.  No, not normally.
> Q.  So how would you know where to watch for the problem or where to look for the problem?
> A.  Just experience, you know.  I guess to be a field service engineer you got to have a logical mind…It's just a logical list you go through mentally, you know.

(Sch. Feb. Dep. 59:20-60:5).

### Plaintiffs Used Administrative Tools Differently.

40.     Holaway did not assist customers via telephone due to his hearing problem. (Hol. Aug. Dep. 64:18-65:15).  Holaway did not use his Blackberry phone to conduct work because the print was too small.  (Hol. Aug. Dep. 111:13-22).  Holaway's Outlook calendar would show his "estimated travel time, estimated client time".  (Hol. Aug. Dep. 112:15-18).

41.     Longlois takes calls and emails directly from clients.  (Long. Dep. 104:19-105:4).  Longlois "constantly" checks his cell phone for messages.  (Long. Dep. 213:3-14).  Longlois stores numerous documents on his Stratasys laptop such as copies of completed expense reports and calendar information.  (Long. Dep. 206:21-25).

42.     Schwarze did not use his Blackberry smart phone for anything other than a phone.  (Sch. Feb. Dep. 51:10-18).  Schwarze did not use an Outlook calendar.  (Sch. Feb. Dep. 23:21-25).

### Not All Plaintiffs Performed Upgrades and their Approach to Suggestions & Temporary Fixes Were Different.

43.     Holaway never called anyone at Stratasys to report a repeat problem he was seeing in the field.  (Hol. Aug. Dep. 78:5-12).  Holaway did not upgrade printers.  (Hol. Aug. Dep. 84:3-7).  Holaway created temporary fixes (such as bypassing a circuit).  (Hol. Aug. Dep. 102:16-104:14).

44.     Longlois makes suggestions as to how Stratasys can improve a printer. (Long. Dep. 60:13-24).  Longlois upgrades printers.  (Long. Dep. 141:20-21).  Longlois may suggest to a customer that they upgrade or change printers based on their application.  (Long. Dep. 48:1-8).  Longlois has created temporary fixes for customers, such as using an over grade fuse or different vacuum source.  (Long. Dep. 163:9-164:6).

45.     Schwarze performed upgrades to machines and software in the machines. (Sch. Feb. Dep. 32:4-22).  It was "not unusual" for him to contact Stratasys to identify repeat problems in the field. (Sch. Feb. Dep. 41:16-42:11).  Schwarze did not create temporary fixes for printers.  (Sch. Feb. Dep. 92:14-19).

### Plaintiffs' Alleged Hours of Work Differ.

46.     Holaway's hours at a customer varied on the customer's hours, his travel and other elements.  (Hol. Aug. Dep. 39:3-10).  Holaway's estimation of his average

14

hours worked each week varies from "45/50/55/60 hours a week" to exactly "60" to "62 to 70 hours" to 70 hours "minimum".  (Hol. Aug. Dep. 213:1-21, 221:7-19, Ex. 3; Hol. March Dep. 26:9-29:2, 28:7-17, 39:11-40:17, 43:24-44:5; July 18, 2013 Deposition of Greg Holaway ("Hol. July Dep.") attached to Tarara Aff. ¶ 9, Ex. H at 279:22-280:3; 282:1-7; 288:3-293:9; 341:6-24; Ex. 11).  When estimating his weekly average hours, Holaway counted each week as Monday-Friday, 40 hours, 8:00 am to 5:00 pm (1 hour lunch break) and an average of 20 to 30 hours either before or after those days/times spent traveling, on-site and doing paperwork such as expense reports, travel plans and case work.  (Hol. March Dep. 21:5-22:13; Hol. Aug. Dep. 178:12-17).  It would not be uncommon for Holaway to do some work on a PTO day such as making travel arrangements and emailing a customer stating he was coming.  (Hol. March Dep. 32:12-33:15; 36:20-38:11).  Occasionally, Holaway would arrive at a customer and need to order a part, he would then have to go back to the hotel and wait for the overnight package to arrive.  (Hol. Aug. Dep. 82:19-83:21).

47.    Longlois sometimes breaks for lunch, but most often works through lunch. (Long. Dep. 139:22-25).  Longlois testified that a six week period (when he did record his time after January 1, 2013) cannot be used as an average looking back because "[i]t varies tremendously all the time.  The work load changes.  The amount of communication between customers changes, the number of receipts you may have to deal with because you're on the road longer.  There's a lot of different factors that make it go up and down." (Long. Dep. 237:11-25).  For example, "[s]ometimes I have been to as many as

four sites in one day.  That complicates your paperwork tremendously because now you have got to document all those case notes for four different sites for one day."  (Long. Dep. 238:4-11).  In a given week, even if he visits four customers each week, the time worked each week "var[ies] drastically".  (Long. Dep. 258:15-21).  In 2010, Longlois spent "[a]t least" 50 to 60 hours working per week.  (Long. Dep. 127:5-12).  In February 2013, Longlois (a current Stratasys employee) testified that he spent "[a]t least 55 hours" working on average each week but "often" it was more.  (Long. Dep. 264:18-265:9; 283:10-19).  Longlois ultimately decided he averaged 60 hours of work per workweek. (Docket No. 132-2, Attach. A).

48.     Schwarze typically did not take a break for lunch.  (Sch. Feb. Dep. 65:18-20).  It is "really hard [for Schwarze] to say" how long administrative work would take him as it depended on the entries, how backed up the expense reporting system was, reconciling, and the end of the month.  (Sch. Feb. Dep. 49:4-20).  Schwarze did not have an average amount of clients he would visit in a week; it "varied so much" because sometimes he "always had a call in [his] back pocket" while other times he had very few customer visits.  (Sch. Feb. Dep. 63:5-13; 65:15-17).  Schwarze would usually only visit a single client in a day, and usually spend more than one day at a single client.  (Sch. Feb. Dep. 65:3-8).  Schwarze has no idea of the average amount of hours he worked each week and testified he couldn't estimate it under oath" as he "could be off hundreds of hours".  (Sch. Feb. Dep. 68:9-22; 72:23-73:24; 74:12-18; 75:12-25).  He testified that he has difficult time remembering facts and things in general and that Stratasys' records of

his past activities "definitely" would be more accurate than his memory.  (Sch. Feb. Dep. 107:4-5; 152:25-153:3).   Yet, five months after his March 2013 deposition, Schwarze testified he worked an average of 57 hours each week.  (July 18, 2013 Deposition of Duane Schwarze ("Sch. July Dep.") attached to Tarara Aff. ¶ 10, Ex. I at 217:17-221:6; 260:17-21; 265:1-266:6; 267:3-21; 269:18-270:1); (Docket No. 132-1, Attach. A).

### Plaintiffs Spent Their Time Differently When Not Preparing For, Traveling To or at a Customer Location.

49.     Holaway's activities while not at a customer location are set forth at Docket No. 50, pp. 10-11.

50.     On days that Longlois was not scheduled for a project, he would be "ready to go and available" and use that time to do "other things if [he] need[ed] to, such as expense reports, review case notes, look at schedules, look at what's coming up" and maybe some online corporate training.  (Long. Dep. 110:10-111:18).  Longlois would sometimes work on administrative tasks while on downtime at a customer's location. (Long. Dep. 189:2-15).  Longlois' wife sometimes traveled with him.  (Long. Dep. 84:7-15).

51.     Schwarze could get a call at noon and ask when he could get a flight to a customer; he would check the airlines and advise Stratasys if he could make it out that day or if he had to wait until the first flight the following morning.  (Sch. Feb. Dep. 102:17-103:6).

**Plaintiffs' Alleged Damages Vary Greatly.**

52.     Holaway alleges he is owed "approximately" $91,498.40 for 131 weeks of overtime (based on 3 years backwages), and with liquidated damages he seeks $182,997 plus attorneys' fees.[5]  (Docket No. 132-1, Attachment A).

53.     Longlois alleges he is owed "approximately" $142,446.40 for 157 weeks of overtime (based on 3 years backwages), and with liquidated damages he seeks $284,892.80 plus attorneys' fees.  (Docket No. 132-2, Attachment A).  Longlois includes his $92.31/wk car allowance as wages.  Id.

54.     Schwarze alleges he is owed "approximately" $66,744.66 for 94 weeks of overtime (based on 3 years backwages), and with liquidated damages he seeks $133,489.32 plus attorneys' fees.  (Docket No. 132-3, Attachment A).

---

[5] On April 15, 2013, Plaintiffs' counsel estimate of attorneys' fees was $260,000 and he confirmed that the damage calculations reflected that Plaintiffs sought, as liquidated damages, *two times* the wages allegedly owed to Plaintiffs.  (Tarara Aff. ¶ 11, Ex. J). However, as of July 2013, Plaintiff Holaway and Schwarze testified that they are actually seeking liquidated damages in an amount *equal* to the wages allegedly owed them.  (Hol. July Dep. 298:12-300:5; Sch. July Dep. 258:21-259:17)

**Plaintiffs Have Different Creditability Issues.**[6]

**Holaway's Creditability Issues**

55.     Holaway has changed his "estimation" of hours worked numerous times over the course of the litigation (often depending on whether he was questioned by opposing counsel or his own) – from an average of 45 hours to over 70:

| Testimony | Date | Citation |
|---|---|---|
| "45/50/55/60 hours a week" | 2/8/12 | Hol. Aug. Dep. 221:7-19; Ex. 3 |
| "62 to 70 hours" on average a week | 8/15/12 | Hol. Aug. Dep. 213:1-11 |
| "Somewhere between 60 and 70 hours a week on average" | 3/6/13 | Hol. March Dep. 11:11-23; 12:9-17; 28:7-29:2 |
| "61 to 70 hours a work week" | 3/6/13 | Hol. March Dep. 26:13-17; 27:6-13 |
| 70 hours "minimum" | 3/6/13 | Hol. March Dep. 28:7-17 |
| "at least 61 hours during the work week on average" | 3/6/13 | Hol. March Dep. 28:19-29:2 |
| "62 to 70" | 3/6/13 | Hol. March Dep. 39:11-40:17 |
| "I worked approximately 60 hours a week."; "Jarvis and I worked on this number together and came up with it as a reasonable approximation" | 7/18/13 | Hol. Jul. Dep. 279:22-280:3; 282:1-7; Exhibit 11 |
| "on a weekly average I worked 20 hours in excess of 40" | 7/18/13 | Hol. Jul. Dep. 288:3-8 |

56.     When questioned by Stratasys' counsel, Holaway testified that it "varied" how much time it took him to enter client information into SalesForce, from 30-60 minutes per customer, and he typically visited two to four customers per week.  (Hol. Aug. Dep. 79:14-21; 81:4-10; 145:8-10).  When questioned by his own counsel, Holaway

---

[6] The credibility issues set forth herein are meant to be illustrative for purposes of decertification and assume that the testimony and evidence is admissible.  It does not waive or address hearsay, foundation and authenticity issues that Plaintiffs have, among other evidentiary hurdles that will be addressed at the proper time consistent with the Court's orders.

testified he spent "[f]our to five hours" a week on this task, which would equate to visiting four to ten customers per week.  (Id.; Hol. Aug. Dep. 206:2-9).

57.    In August 2012, Holaway testified he spent an average of 10 to 12 hours a week on administrative tasks, two to three hours of which were on the weekend.  (Hol. Aug. Dep. 143:12-23; 211:21-212:5).  In March 2013, Holaway testified he spent three to four hours on average working per weekend.  (Hol. March Dep. 22:14-16; 38:12-22).

58.    In August 2012, Holaway testified that he spent an average of two to three hours per week preparing to travel.  (Hol. Aug. Dep. 143:8-11; 176:2-6).  When questioned by his own counsel, Holaway testified he spent an average of two to three hours per day on this same task.  (Hol. Aug. Dep. 176:2-17; 178:12-17).

## Longlois' Creditability Issues

59.    Longlois alleges damages for working an average of 60 hours per workweek.  (Docket No. 132-2, Attach. A).  However, in his February 2013 deposition, Longlois testified that he stated in his 2010 performance review that was working a "50 to 60 hour work week".  (Long. Dep. 127:5-12).  He then testified that his interrogatory answers were still accurate, in which stated his overtime hours varied greatly from day-to-day and week-to-week. (Long. Dep. 126:22-127:3).  When later questioned by his attorney, he testified he worked a minimum 55 hours per week.  (Long. Dep. 264:18-265:7).

60.    Longlois testified he spends "[m]aybe an hour" to prepare for a trip.  (Long. Dep. 85:11-15).  He also testified he visits approximately four customer sites per week

and spends at least four to six hours per week to prepare for trip (equating to 1 to 1.5 hours prep time per trip).  (Long. Dep. 125:17-20; 126:11-21).

61.    Longlois admitted that since January 1, 2013 he has been required to track his time and "clock in and out".  (Long. Dep. 100:20-101:11).  However, he also testified that there were instances where he would "have to clock in or out at a different time than when you actually left and when you actually returned" and would clock in at an arbitrary time and wait for time to pass before clocking out.  (Long. Dep. 101:9-103:19; 224:9-11).

### Schwarze's Creditability Issues

62.    Schwarze is 72 years old.  (Sch. Feb. Dep. 107:4-5).  He testified he has a "difficult time" remembering "facts and things in general" including some of the facts surrounding products during his employment at Stratasys.  (Sch. Feb. Dep. 107:16-108:4; Sch. July Dep. 290:19-24).  Schwarze "sometimes get[s] confused when questions are asked of [him] that are fairly long".  (Sch. July Dep. 291:4-8).  Schwarze "sometimes get[s] confused when questions are asked and answered of [him]".  (Sch. July Dep. 291:10-12).  Schwarze's "problems remembering things or becoming confused" is something that he and others have noticed.  (Sch. July Dep. 291:20-24).

63.    Schwarze admitted he padded his performance reviews with as much "fluff" as he could (for example, one performance review states he developed troubleshooting procedures and passed it along to other FSEs which he testified was "more fluff" as he never did that).  (Sch. Feb. Dep. 39:14-24; 42:12-23; 43:13-15).

64.    In February 2013, Schwarze testified he was not trained on the 900, the cream of the crop 3D printer (Sch. Feb. Dep. 15:24-16:1).   Yet, in his March 2013 responses to interrogatories, Schwarze answered that he was trained on all of Stratasys' "main 3D products" (Docket No. 132-1 at pp. 4-5).

65.    Schwarze answered in his interrogatories that that he was assigned service territories.  (Docket No. 132-1 at p. 5).  Yet, Schwarze testified he was a "floater" with no territory.  (Sch. Feb. Dep. 45:6-22).

66.    Schwarze answered in his interrogatories that he was "Required to use 'White Space' Scheduling System" (Docket No. 132-1 at p. 5), yet he testified that he knows he "looked at it" but didn't recall using it.  (Sch. Feb. Dep. 101:21-102:16).

67.    Schwarze's interrogatory answers stated he was required to use the SalesForce software (Docket No. 132-1 at p. 5), yet he testified that the name SalesForce did not sound familiar to him.  (Sch. Feb. Dep. 118:19-22).

68.    In February 2013, Schwarze testified that any average hours he were to give for time spent doing administrative work "would just be a guess".  (Sch. Feb. Dep. 64:2-24).  He further testified that he had "no idea" of how much he was due in overtime because he tried to estimate it in his head but stopped because of the variables he could be off "hundreds of hours".  (Sch. Feb. Dep. 68:9-22; 72:23-73:24; 74:12-25).  Yet, in July 2013, Schwarze confirmed that he is seeking damages for working an average of 17 hours of overtime per week doing administrative work.  (Docket No. 132-1, Attachment

A) (Sch. July Dep. 217:17-221:6; 260:17-21; 265:1-266:6; 267:3-21; 269:18-270:1; 286:2-24).

## II.   LEGAL ANALYSIS

The purpose of a collective action is to allow "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.   The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity."   Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 170 (1989) (ADEA claim analyzing 29 U.S.C. § 216(b)).   The benefits of a collective action are not realized when, as in a misclassification case, the question of whether any individual is exempt from overtime is an "intensely fact bound and case specific question".   Keef v. M.A. Mortenson Co., No. 07-3915, 2009 WL 465030 at * 2 (D. Minn. Feb. 24, 2009) (Rosenbaum, J.) (citing Rutlin v. Prime Succession, Inc., 220 F.3d 737, 740 (6th Cir. 2000).   In a misclassification case, as here, the FLSA exemption analysis is based on an individual's day-to-day activities and responsibilities which do not comport with a collective action:

> The jury will need to assess each Plaintiff's level of discretion in carrying out the…work and whether it relates to matters of significance.   This separate analysis 'must be applied in light of all the facts involved in the particular employment situation.' 29 C.F.R. § 541.202(b)….These factors require consideration of each Plaintiff's unique employment situation, job duties, and interactions with…customers.   Analysis on a collective basis will be difficult because Plaintiffs have little supervision, interact with customers in different manners, and give conflicting testimony regarding the extent to which they independently solve problems versus follow an established…process to resolve issues.

Cruz v. Lawson Software, Inc., 764 F.Supp.2d 1050, 1057 (D. Minn. 2011) (Davis, C.J.).

## A.      THE DECERTIFICATION STANDARD.

As the class has been conditionally certified and discovery closed, the case is now in the second phase, when the defendant moves to decertify the class.   Lyons v. Ameriprise Fin., Inc., No. 10-503, 2010 WL 3733565, *2 (D. Minn. Sept. 20, 2010) (Kyle, J.).   While there is an "extremely low bar to conditional certification of FLSA collective actions", the second phase uses a much stricter standard to determine whether putative class members are "similar situated" in order to proceed to trial collectively. Mem. and Order (Docket No. 72) at pp. 4, 9 (citing Thompson v. Speedway SuperAmerica LLC, No. 08-1107, 2009 WL 130069, *5 (D. Minn. Jan. 20, 2009) (Schiltz, J.).

The similarities between the name plaintiff and the opt-in plaintiffs "must extend beyond the mere facts of job duties and pay provisions."   Burch v. Qwest Commc'ns, Int'l, 677 F. Supp. 2d 1101, 1114 (D. Minn. 2009) (Davis, C.J.) (citing Anderson v. Cagle's, Inc., 488 F.3d 945, 953 (11th Cir. 2007)).   In order to make this determination, courts review three factors:

> (1) the extent and consequence of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and, (3) fairness and procedural considerations.

Burch, 677 F.Supp.2d at 1114.   Additionally, Plaintiffs must demonstrate that they are victims of a common unlawful pay policy or plan "that negatively impacted the original

and opt-in Plaintiffs." Id.; see also Saleen v. Waste Mgt., Inc., 649 F.Supp.2d 937, 940 (D. Minn. 2009) (Schiltz, J.).

Ultimately, Plaintiffs carry the heavy burden to show that they are "similarly situated". Smith v. Heartland Auto. Servs., Inc., 404 F.Supp.2d 1144, 1149 (D. Minn. 2005) (Kyle, J.). For this reason, "[i]t is not uncommon for courts in FLSA cases to certify a conditional class only to decertify that class during the second phase. The decision to certify or decertify a class under 29 U.S.C. § 216(b) is within this Court's discretion." Soderberg v. Naturescape, Inc., Mem. and Order, No. 10-3429, Docket No. 128 at p. 21 (D. Minn. Nov. 3, 2011) (Magnuson, J.) (attached to Tarara Aff. ¶ 12, Ex. K) (citing Nerland v. Caribou Coffee Co., Inc., 564 F.Supp.2d 1010, 1018 (D. Minn. 2007) (Schiltz, J.)). This is especially true in misclassification cases where an individual cannot be representative of a collective group due to the very individual nature of the requirements for meeting FLSA exemption. See Soderberg v. Naturescape, Inc., Mem. and Order, No. 10-3429, Docket No. 128 (D. Minn. Nov. 3, 2011) (Magnuson, J.) (attached to Tarara Aff. ¶ 12, Ex. K); Espenscheid v. DirectSat USA, LLC, 2011 WL 2009967, *6-7 (W.D. Wis. May 23, 2011); Wright v. Pulaski County, 2010 WL 3328015, * 10 (E.D. Ark. Aug. 24, 2010); Cruz, 764 F. Supp. 2d 1050; Keef, 2009 WL 465030; Thompson, 2009 WL 130069; Carlson v. C.H. Robinson Worldwide, Inc., No. 02-3780, 2006 WL 2830015, at *10 (D. Minn. Sept. 26, 2006) (Ericksen, J.).

**B.**     **THE PUTATIVE CLASS WAS UNMOTIVATED TO JOIN THE LITIGATION.**

As the purpose of conditional certification is to provide an opportunity for others to decide whether to join the lawsuit, as in <u>Keef</u>, this Court should be mindful that the great majority of potential class members were unmotivated to join the collective action. <u>See</u> <u>Keef v. M.A. Mortenson</u>, Order, No. 07-3915, Docket No. 105 at p. 6 (D. Minn. Feb. 24, 2009) (Rosenbaum, J.) (attached to Tarara Aff. ¶ 13, Ex. L).   In addition to the named plaintiff, there are only two opt-in plaintiffs, one of whom opted-in prior to conditional certification.   Thus, the result of the conditional certification and judicial notice was to attract a single opt-in plaintiff.   This is indicative that a collective action is inappropriate. <u>Id</u>. at pp. 6, 7 (when a fact-intensive inquiry is involved and there is a lack of enthusiasm for opting-in, a collective action is "inappropriate"); <u>West v. Border Foods, Inc.</u>, No. 05-2525, 2006 WL 1892527 at * 6 (D. Minn. July 10, 2006) (Frank, J.).

**C.**     **PLAINTIFFS WERE NOT HARMED BY A COMMON UNLAWFUL PAY POLICY.**

Plaintiffs must demonstrate that they are victims of a common unlawful pay policy or plan "that negatively impacted the original and opt-in Plaintiffs." <u>Burch</u>, 677 F.Supp.2d at 1114; <u>see also</u> <u>Saleen</u>, 649 F.Supp.2d at 940.   Plaintiffs allege Stratasys had a policy and practice of classifying FSEs as exempt and paying them a salary. (Complaint at ¶ 47).   This is absolutely correct.   However, Plaintiffs cannot put the cart before the horse.   In order to demonstrate that they are *victims* of a common policy or plan to pay them less than they are entitled, Plaintiffs must first prove that the policy is

unlawful.  Thus, they must show that they worked more than 40 hours per week for each week Plaintiffs seek damages, and then the Court must make an individualized determination whether the individual was misclassified and owed overtime for the hours (if any) that they can show that they worked more than 40 in a workweek.  See Douglas v. First Student, Inc., 888 F.Supp.2d 929, 934 (E.D. Ark. 2012).

In a collective action, this becomes problematic and confusing for a jury.  For example, before classification of exempt versus non-exempt is even considered, Plaintiffs must first prove that they worked more than 40 hours for each week.  Plaintiffs cannot do this collectively.  Each plaintiff must prove, for each week that they seek damages, that they worked more than 40 hours.  Next, Stratasys has the opportunity to rebut those showings and prove otherwise with its business records, witness testimony and other admissible evidence.  For example, Stratasys will show, for each Plaintiff, that in some weeks it was impossible for the plaintiff to work more than 40 hours due to a variety of reasons (such as PTO, military leave, lack of work).  This will require looking at 382 collective weeks of work performed.

Once a review of each Plaintiff's weekly hours is complete, the Court must look at each individual's job duties and responsibilities and determine if they were misclassified as exempt from overtime.  This is a highly individual and fact intensive process.  This misclassification process creates three trials in one which cuts against the concept of a collective action whereby one plaintiff is representative of the others.

Since an exempt employee is not entitled to overtime pay pursuant to 29 U.S.C. § 207(a), if any one of the plaintiffs were properly classified (which Stratasys gets to prove), the plaintiff could not have been negatively impacted and cannot be similarly situated to another who was improperly classified.  Similarly, if one plaintiff cannot show that he worked more than 40 hours in a week, even if improperly classified, he has no damages.  Likewise, a plaintiff may have been properly classified but worked overtime, in which case they too have no damages.  This is why misclassification cases are inappropriate for collective action - - because the determination of the rights of one individual has no bearing on or determine the rights of another.  See Soderberg, Mem. and Order; Cruz, 764 F. Supp. 2d 1050; Keef, 2009 WL 465030; Carlson, 2006 WL 2830015, at *10.

**D.     PLAINTIFFS' DIFFERENT FACTUAL AND EMPLOYMENT SETTINGS.**

Decertification is proper where factual and employment settings among the class are too dissimilar. Koren v. Supervalu, Inc., No. 00-CV-1479, 2003 WL 1572002, *15 (D. Minn. Mar. 14, 2003) (Montgomery, J.).  Plaintiffs bear the burden to show that despite differences (such as working in different states, reporting to different supervisors, length of time on the job, salary, hours worked, having different employment status), a collective action is justified.  Keef, 2009 WL 465030; Nerland, 564 F.Supp.2d at 1018; Ulvin v. Northwestern Nat. Life Ins. Co., 141 F.R.D. 130, 131 (D. Minn. 1991) (Magnuson, J.).

28

Plaintiffs must show more than the simple fact that they share a common employer and pay scheme; rather, the "court must also look to specific factual similarities or differences and manageability concerns." Ray v. Motel 6 Operating, Ltd., P'ship, Ltd., No. 3-95-828, 1996 WL 938231, *4 (D. Minn. Mar. 18, 1996) (Kyle, J.); see also Lusardi v. Xerox Corp., 122 F.R.D. 463, 466 (D. N.J. 1988).   Likewise, a common job description or use of common installation guides does not necessarily weigh in favor of certification.  See Cruz, 764 F.Supp.2d at 1057; see also Nerland, 564 F.Supp.2d at 1020; Smith, 404 F.Supp.2d at 1151.  Nor is the fact that plaintiffs were all classified as exempt "strong evidence when evaluating whether employees are similarly situated" as the "employer's classification means little compared to the employee's actual job duties and circumstances."  Cruz, 764 F.Supp.2d at 1058.  The extent and consequence of the different factual and employment settings, as detailed below, favors decertification.

### a.   Plaintiffs' On-The-Job Experience & Educational Backgrounds Differs.

Plaintiffs' educational backgrounds and on-the-job experiences are vastly different.  Holaway was a 5 year employee whereas Schwarze was a 15 year Stratasys FSE.  Longlois is in the middle, having worked three years (and being the first field-based FSE), leaving and returning, and now has about 8 years' experience with Stratasys as a FSE and continues to accumulate knowledge and experience.  The Plaintiffs' educational backgrounds also differ.  Holaway has a two-year Electronic Technology Certificate while Longlois has a four-year bachelor's degree, an associate degree in

29

Applied Science, and took masters level courses for Information Systems.  Schwarze, on the other hand, took Electronic Engineering classes for over a year, and has a two-year Computer Electronics degree.

      **b.**      **Plaintiffs' Supervision and Reporting of Time Was Dissimilar.**

Plaintiffs reported to different managers who were located in different states. However, like in <u>Cruz</u>, the managers merely divided the work and did not monitor the work details.  764 F.Supp.2d at 1060-1061.  Each individual, like <u>Cruz</u>, was at a customer site alone and without a supervisor (or any other FSE) which "cuts against a finding that Plaintiffs are similarly situated".  <u>Id</u>. at 1061.

The level of autonomy and reporting of travel and work time varies significantly. For example, Holaway reported to King and rarely dealt with anyone else at Stratasys. He would receive his trips through Outlook and email King only when he was leaving home and would provide an estimated time he expected to arrive at the customer. Schwarze also reported to King, but received his trips by a telephone call from King and would likewise call King to let him know when he started at the project and when he left. Longlois, on the other hand, reports to Hodges and is much more detailed in reporting his daily whereabouts.  Longlois uses Outlook to receive his assignments, and also sends emails to FDM Dispatch letting both King and Hodges know when he leaves his house, when he arrives at clients, when he leaves the client site, and when he arrives at his hotel.

### c.    Plaintiffs' Location of Work and Travel Methods Are Different.

Conditional certification is inappropriate where the plaintiff and opt-ins worked at various locations.  West, 2006 WL 1892527 at *7–8; Ray, 1996 WL 938231 at *4; Ulvin 141 F.R.D. at 131; Lusardi, 122 F.R.D. 463.   Not only did Plaintiffs work out of their homes in different states, but the work was performed at customer locations across the nation.   Holaway performed work in over 22 states, splitting his travel equally between driving and flying.   Longlois performed work mostly along the northern part of the East Coast and drives 90% of the time.   Schwarze was a floater, traveling (flying) to at least 40 of the states and rarely slept at home during the week.

### d.    Plaintiffs' Daily Job Duties & Methods of Work Are Different.

The similarities among the plaintiffs must extend beyond job duties and method of pay.  Burch, 677 F.Supp.2d 1114.  The record is clear that while each plaintiff was a FSE, their actual job duties and methods of performing that work varied.  Plaintiffs were not all trained to work on the same 3D printers.   Schwarze was unable to install, repair, or maintain the newest and largest printer –the 900; Holaway on the other hand was unable to install, repair or maintain the older printers such as the Genesis.   Once in the field, Holaway and Longlois worked independently and did not seek advice of other FSE, whereas Schwarze would help other FSEs with problems and they would assist him. Holaway and Longlois installed new printers, whereas Schwarze did not in the past three years.

Longlois is a heavy Blackberry/cell phone user in performing his duties, whereas Holaway avoided talking on the phone and reading work on his phone; Schwarze used his phone to talk only. Longlois and Holaway would spend hours or days training customers (both after an installation and maintenance) whereas Schwarze did not train customers. Longlois brings a trunk full of "spare parts" with him, whereas neither Holaway nor Schwarze did.

Holaway did not always follow a checklist, but checked it after the fact. Longlois used a checklist for installations and preventative maintenance, but not repairs. Schwarze did not use a checklist for installations because he did not perform any installations nor did he use one for emergency repairs, but he did use a checklist for preventative maintenance. Holaway did not perform upgrades to printers unlike Longlois and Schwarze. Holaway also did not work with Stratasys corporate when he identified repeat problems in the field, unlike Longlois and Schwarze. Holaway and Longlois would create temporary fixes for printers whereas Schwarze did not.

**e.      Plaintiffs' Hours of Work Varied Greatly Each Week.**

Each plaintiff must individually prove he worked more than 40 hours in any week that he claims damages. Douglas, 888 F.Supp.2d at 934. Thus, determination of whether Stratasys is liable to any one of the plaintiffs requires "a highly individualized inquiry as to each class member's circumstances every day of every week." Id. at 929. Because this is "central to the question of liability, treatment of plaintiffs' claims on a collective

basis is inappropriate." Id. Dissimilar damages weighs towards decertification. Ray, 1996 WL 938231 at * 4; West, 2006 WL 1892527 at *9.

For example, how long it took each FSE to travel to a site, complete the work and complete administrative tasks is an individual inquiry. Id. Like Douglas, Plaintiffs argue that accurate records of their time do not exist and that Stratasys' documents are "irrelevant, inaccurate, and provide[] little to no aid in assisting Plaintiffs in determining their total regular hours worked during a workweek hours nor in accurately assessing their overtime hours worked during a workweek". (Docket No. 130 at pp. 10). However, that does not change Plaintiffs' burden of proof and allow one FSE to testify as to how much work any other FSE performed in any given week.

Again, as acknowledged in Douglas, that is an inquiry that will require individual testimony from each Plaintiff about each job each week. Douglas, 888 F.Supp.2d at 929. This individualized inquiry defeats the entire purpose of a collective action because it will predominate the trial and complicates the matter for the jury and counsel by having three mini-trials in one. Further, as noted above, each plaintiff has different creditability issues which will further complicate proceeding collectively.

Another example is the amount time each individual took for lunch and the amount of customers visited in a single workweek (which would change the corresponding administrative work). Holaway took one hour lunch breaks, worked 60-70 hours per week, and did not use his Blackberry to check email and communicate with customers. Longlois, on the other hand, testified that his overtime hours varied

drastically and that even a current six week period (when he has been recording his time) cannot be used as an average looking back as his time varies so drastically.  Longlois may visit four customers a day, although it is typically four per week, while Schwarze typically only visited a client in a single day, and often spent more than one day at a single client.  Unlike Holaway, Schwarze did not usually break for lunch, and has no idea how many hours he believes he worked in a week; he testified that Stratasys' records of his past would definitely be more accurate than his memory.

When not at a customer site, Holaway would do as he pleased at home so long as he could travel to a customer if the need arose.  Longlois would do administrative work during his down time, and Schwarze would make the determination when/if he would fly out to a customer upon receiving the call.  Simply, the activities performed by each individual Plaintiff in a workweek vary significantly and call for an individual analysis, making a collective action inappropriate.

**f.      Plaintiffs' Alleged Damages and Evidentiary Proof Are Not Similar.**

Damages are an essential element in a wage and hour case, especially where, as here, the only relief Plaintiffs seek is damages.  In such a case, decertification of a class is "required" where there is a variance in damages across class members, as here. Espenscheid v. DirectSat USA, LLC, 705 F.3d 770 (7th Cir. 2013) (Posner, J.).  As Judge Posner aptly stated:

> And to determine damages would, it turns out, require…separate evidentiary hearings…For it's not as if each technician worked from 8 a.m. to 5 p.m. and was forbidden to take a lunch break and so worked a 45 hour week (unless he missed one or more days because of illness or some other

reason) but was paid no overtime. Then each technician's damages could be computed effortlessly, mechanically, from the number of days he worked each week and his hourly wage…Nothing like that is possible here. The suit charges that [the employer] concealed its violations by forbidding the technicians to record time spent on certain tasks, such as calling customers, filling out paperwork, and picking up tools…some, maybe many, of the technicians may not work more than 40 hours a week and may even work fewer hours; others may work more than 40 hours a week. Variance would also result from different technicians' doing different tasks, since it's contended that the employer told them not to report time spent on some of those tasks, though – further complicating the problem of proof – some of them reported that time anyway.

Id. at 773-74.

Indeed, the basis for each plaintiff's damages is different and to determine damages would require a separate evidentiary hearing for each individual. Similar to Espenscheid, Plaintiffs did not work 8 to 5, did not track their time, and argue that they were not paid for tasks such as administrative work filling out paperwork (online). In addition, only Longlois includes his car allowance as a wage for overtime purposes.

Further differing the individuals, Longlois has recorded his time after January 1, 2013 which would show his average ratio of administrative time to customer visits. As a current employee and detail-oriented person, there is also significantly more information regarding Longlois' travel, mileage, hotel, and the like than, for example, Schwarze, who testified he has a hard time remembering things and gets confused easily. Accordingly, Holaway could not testify as a representative for Longlois, nor could Schwarze testify for Longlois. Plaintiffs are all seeking very different degrees of damages for different weeks, based on different resources and different inclusion of compensation as "wages".

Further, each plaintiff was paid a different salary, took different amounts of PTO (some want credit for PTO as work time) and unpaid leave.

Not surprisingly, the three individuals' alleged damages (even based on their own flawed methodology and without the use of any admissible evidence whatsoever) are extremely different. Exclusive of attorneys' fees and costs, Holaway alleges he is owed $182,997, Longlois $284,892.80, and Schwarze $133,489.32. The difference in alleged damages is remarkable.

## B.   STRATASYS' AFFIRMATIVE DEFENSES.

When a defendant asserts affirmative defenses that are individual in nature, "significant case management concerns" arise, weighing in favor of decertification. Cruz, 764 F.Supp.2d at 1061-62 (citing Anderson v. Cagle's, 488 F.3d 945, 954 n. 8 (11th Cir. 2007)). Stratasys relies on several individual affirmative defenses including, (a) Plaintiffs were each properly classified by Stratasys as exempt from the overtime provisions of the FLSA; (b) Plaintiffs did not work more than 40 hours in some or all of the workweeks in which they seek damages; and, (c) Plaintiffs have various (and different) credibility issues directly relating to the performance of and extent of "work" they allege they performed.

### a.   The FLSA Exemption Analysis is Individual to Each Plaintiff

The FLSA exempts "white collar" individuals from overtime; those who work in a "bona fide executive, administrative, or professional capacity". 29 U.S.C. § 213(a)(1). Whether an individual is exempt from overtime is an individual fact-intensive inquiry

"based on each person's actual, 'day-to-day activities and responsibilities.'"  <u>Cruz</u>, 764 F.Supp.2d at 1062 (citing <u>Keef</u>, 2009 WL 465030 at *2); <u>see</u> <u>also</u> <u>Carlson</u>, 2006 WL 2830015 at *10.[7]

Plaintiffs have alleged they are not exempt from the overtime provisions of the FLSA.   As an affirmative defense, Stratasys has averred that Plaintiffs were each properly classified as exempt, and therefore, not entitled to overtime.   Thus, the jury will need to determine, among other things, the job duties of each plaintiff, how they spent their time, what kind of work they did (exempt or non-exempt), the relative importance of their exempt duties, and the level of direct supervision.   <u>Cruz</u>, 764 F.Supp.2d at 1062. This information is individual; what one person does on a daily basis has no bearing on what another does for purposes of the FLSA exemption.   29 C.F.R. § 541.700.

Given the individual analysis required under this affirmative defense, the issue of whether each plaintiff is exempt or non-exempt will cause "significant issues" in the form of a collective action as it will "dwarf the straightforward issue of damages as to the named Plaintiffs."  <u>Soderberg,</u> Mem. and Order at p. 22.   Accordingly, here, as in <u>Cruz</u>, <u>Keef</u>, <u>Carlson</u> and <u>Soderberg</u>, a collective action is unwarranted.

---

[7] At the decertification stage, the Court need not determine whether in fact the individuals are exempt for decertification, but rather the Court looks at the FLSA standards to determine "whether Plaintiffs are similarly situated in relevant respects."   <u>Smith</u>, 404 F.Supp.2d at 1148.

### b.      Plaintiffs Did Not Work More Than 40 Hours Per Week.

If an individual is not entitled to overtime because he worked less than 40 hours in a work week, the employer may assert such an affirmative defense.  Hertz v. Woodbury County, Iowa, 566 F.3d 775, 783 (8th Cir. 2009).  This is the case here.  Stratasys has affirmatively alleged that Plaintiffs were properly classified (and not entitled to any overtime) and even if they were improperly classified, they did not work more than 40 hours in some, or all, of the weeks alleged.  Thus, Stratasys first must be able to show that Plaintiffs are exempt from overtime as noted above.  Then, Plaintiffs must show that they indeed worked 40 hours in the weeks in which they seek overtime.  (Plaintiffs even acknowledged that several weeks they worked less.)  The fact that Stratasys has alleged (and will pursue) this affirmative defense weighs in favor of decertification.

### c.      The Creditability of Plaintiffs Is Disputable and Will Overtake Trial.

Where the credibility as to an individual opt-in plaintiff is questionable, and the employer intends to present individualized defenses, as here, "[t]his inquiry alone would render collective treatment unmanageable."  Soderberg, Mem. and Order at p. 22-23, (attached to Tarara Aff. ¶ 12, Ex. K); see also Smith v. Heartland Auto. Svcs., 404 F.Supp.2d at 1154.  In this case, as detailed above, the named plaintiff and two opt-ins all have various (and different) creditability issues that will need to be addressed at trial, complicating the issues.  The fact that three individuals working across the nation, who all testified that their jobs varied greatly day-to-day and week-to-week, and yet all seek 17 or 20 hours of overtime is highly suspect.

Holaway's testimony of the overtime hours he worked changes dramatically from pre-litigation written remarks (of "45/50/55/60 hours") to post-litigation deposition questioning by his own attorney (an average of 70 hours "minimum").   Stratasys will raise this creditability issue.   Likewise, Longlois' credibility will be challenged.   For example, he testified that his time records post-January 2013 do not reflect the actual time he worked.   Also, the amount of personal information stored on Longlois' work laptop, accessed at all hours of the day, forms the basis for Stratasys to challenge Longlois' claim for damages on those days he alleges he worked.   As to Schwarze, his creditability is in question and he testified he has a difficult time remembering facts and "things in general".   Schwarze also testified that he lied on his performance reviews and did not, for example, create checklists when he stated he did.   As Plaintiffs have no admissible evidence to support their alleged damages, their creditability – and supposed "approximations" based on their "recollection" will be greatly disputed by Stratasys.

## C.   FAIRNESS, MANAGEABILITY AND PROCEDURAL CONSIDERATIONS SUPPORT DECERTIFICATION.

To determine whether the fairness and procedural considerations favor certification, 29 U.S.C. § 216(a) provides that such actions should: "'(1) reduc[e] the burden on plaintiffs through the pooling of resources, and (2) efficiently resolv[e] the common issues of law and fact that arise from the same illegal conduct.'"   Cruz, 764 F.Supp.2d at 1063 (citations omitted).   In a misclassification case, it is "oxymoronic" to have a collective action where liability rests on individualized proof consisting of

different background facts and different testimony based on each individual's work activities.  Douglas, 888 F.Supp.2d at 936).  In such a case, as here, certification "will unfairly and prejudicially require [the employer] to prepare for and present…different trials simultaneously."  Id.; see also King v. West Corp. 2006 WL 118577, at *15 (D. Neb. 2006) (individual defenses undermines the defendant's ability "to mount a clear and coherent defense to the case").

Where factual and employment settings are so different such that the dominant issue at trial becomes whether an overtime exemption applies to an employee, it is "inevitable" that the matter cannot be adjudicated collectively and decertification is proper.  Carlson, 2006 WL 2830015 at *11; Smith, 404 F.Supp.2d at 1154-55.  Should this matter proceed as a collective action, it will be three separate trials, with various factual differences and affirmative defenses for each plaintiff.  It is inherent in a misclassification case that there are three intensely individualized sets of facts, which favors decertification.

### a.      Plaintiffs' Burden Is Not Reduced by Certification.

When analyzing fairness, manageability and procedural considerations, where class-wide discovery benefits the individual plaintiffs, the plaintiffs are not "overly prejudiced" by decertification.  Smith, 404 F.Supp.2d at 1155.  Similarly here, Plaintiffs have benefitted from consolidated discovery.  Further, according to Paragraph 5 of the Plaintiff Consent Form filed by Longlois and Schwarze (Docket Nos. 29, 78), counsel has already agreed to represent their interests individually if necessary.

**b.      Efficient Resolution of Common Issues of Law and Fact Is Unlikely.**

In a misclassification case, it is a question of law whether an *individual* is exempt from the FLSA's overtime requirements.  Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed. 2d 739 (1986); Jarrett v. ERC Props. Inc., 211 F.3d 1078, 1081 (8th Cir. 2000).   Necessarily, common issues of law are lacking by the inherent individual analysis required for the exemption analysis under the FLSA.  In such an instance, individual damages issues will make class management complicated and Stratasys would not have the opportunity to effectively defend itself.   See Cruz 764 F.Supp.2d 1063.  Certifying a class where there is overwhelming differences between the plaintiffs would be "gross mismanagement of judicial and litigant time and money." Thompson, 2009 WL 130069 at *10).  Accordingly, decertification is proper in this case.

### III.      CONCLUSION

Based upon the foregoing, Stratasys respectfully requests that the Court grant its Motion in its entirety.

Date: August 28, 2013                     By:____s/ Corie J. Tarara_____
                                          Gregory L. Peters
                                          Bar Number 0289401
                                          Corie J. Tarara
                                          Bar Number 0349197
                                          **Attorneys for Defendant, Stratasys, Inc.**
                                          SEATON, PETERS & REVNEW, P.A.
                                          7300 Metro Boulevard, Suite 500
                                          Minneapolis, MN 55439
                                          Telephone: (952) 896-1700
                                          Fax: (952) 896-1704
                                          Email: gpeters@seatonlaw.com
                                          Email: ctarara@seatonlaw.com