## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

---

Greg Holaway,

                    Plaintiff,

v.

Stratasys, Inc.,

                    Defendant.

Court File No.: 12-cv-00998 (PAM/JSM)

**MEMORANDUM OF LAW IN
SUPPORT OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

---

The Defendant, Stratasys, Inc. ("Stratasys"), respectfully submits this memorandum of law in support of Defendant's Motion for Summary Judgment ("Motion"). (Docket No. 168.) The Plaintiff, Greg Holaway ("Plaintiff") is a former Stratasys Field Service Engineer ("FSE") who alleges that Stratasys violated the overtime provisions of the Fair Labor Standards Act ("FLSA") by misclassifying him as an exempt employee. However, despite his claim for overtime damages, Plaintiff cannot prove that he worked over 40 hours in any week. Even if Plaintiff is able to meet this initial burden, Stratasys properly classified him as an exempt employee under the FLSA. In any event, given Plaintiff's contradictory testimony, his reliance on his memory alone in support of his claim does not allow this Court to make a just and reasonable determination of his alleged damages. Lastly, should Plaintiff be allowed to proceed to trial, his damages should be determined by the fluctuating workweek method for the payment of overtime

1

(half-time), a two-year statute of limitations should apply, and the recordkeeping claim should be dismissed.

## I.   <u>STATEMENT OF FACTS</u>.[1]

## A.   STRATASYS' BACKGROUND.

<u>Hardware and Software</u>

1.     Stratasys is a world leader in 3D additive manufacturing, using robotics to melt materials and extrude three-dimensional ("3D") products from toy parts to submarines.  (Memorandum of Law in Support of Defendant's Motion for Decertification of FLSA Collective Action (Docket No. 150) at Statement of Facts ("SOF") ¶¶ 7, 8.)

2.     Stratasys' 3-D printers use various types of materials, have extremely narrow tolerances and use various heating elements, thermal sensors and temperature sensors to maintain their temperature.  (Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Conditional Certification and Collective Notice (Docket No. 50, p. 4.)

3.     Stratasys' 3D printers (the hardware) use two software programs developed by Stratasys: back-end controller software inside the machine; and customer-facing slicing software.  (Docket No. 50 at 4-5.)  They are used by customers who use computer aided design (CAD) software to produce desired objects, and most have "an engineering knowledge, engineering background, model making background."  (<u>Id</u>. at 4.)

---

[1]   For purposes of this Motion only, Plaintiff's facts are taken as true.  Much of the procedural history has been summarized by this Court in its October 28, 2013 order decertifying the conditional class at Docket No. 163 at pp. 1-2.

4.     Stratasys' 3D printers cannot be purchased at a store and generally range from $30,000 to $500,000 each.  (Docket No. 50 at 5).

Field Service Engineers

5.     Stratasys employs FSEs, who are responsible for installing and maintaining the workability of Stratasys' 3-D products.  (Docket No. 33-1 ¶¶ 5, 9.)

6.     FSEs must possess "good troubleshooting sills, diagnostic skills".  (Docket No. 50 at 10.)

7.     If Stratasys' customer call center is unable to diagnose a problem on the telephone, FSEs troubleshoot the product at the customer's site.  (Docket No. 50 at 9.)

8.     FSEs are based out of their home office, have different territories, and "nearly never" see each other in the field and "very rarely work[] together".  (Docket No. 61 ¶¶ 2, 10, 15.)

Administrative Tools

9.     Stratasys uses SalesForce software to maintain customer information and schedule FSEs to a customer's site.  (SOF ¶ 10.)

10.     Until 2012, Stratasys used Whitespace software to schedule and track FSEs in the field.  (SOF ¶ 11.)  Once Stratasys assigned a FSE to visit a customer through SalesForce, it would automatically populate the event onto Whitespace and the FSE's Outlook calendar.  (Id.)

**B.      PLAINTIFF'S EMPLOYMENT WITH STRATASYS.**

11.    On November 6, 2006, Stratasys hired Plaintiff as a FSE for the Midwest area (Wisconsin, Minnesota, North Dakota, South Dakota, Iowa, Nebraska and Colorado).  (Docket No. 50 at 7.)

12.    Stratasys classified Plaintiff as an "exempt" employee, not subject to overtime pay. (Docket No. 88-3 ¶ 2.)

13.    Plaintiff performed work for Stratasys in over 22 states out of his Burnsville, Minnesota home office.  (SOF ¶ 24.)

14.    Plaintiff reported to King, and rarely dealt with anyone else at Stratasys. (SOF ¶ 21.)

15.    Plaintiff worked alone and did not contact other FSEs for help or guidance. (SOF ¶ 37.)

16.    Once scheduled, Plaintiff had no procedure to follow, he was just "expected to take care of [his] customers" and get the information needed before the visit.  (SOF ¶ 13.)

17.    If Plaintiff was not scheduled for a customer visit during the workweek, he could do as he pleased so long as he could travel to a customer if the need arose.  (Docket No. 50 at 10.)

<u>General Job Duties</u>

18.    Plaintiff's job duties and responsibilities "are accurately reflected in Stratasys' Field Service Engineer Job Description", which states that the essential duties and responsibilities of a FSE are:

- Provides installation of Stratasys' hardware and software products at the customer's facility.
- Provides problem diagnosis and repair of Stratasys' hardware and software products at the customer's facility.
- Provides preventative maintenance of Stratasys' hardware products at the customer's facility.
- Follows-up calls after on-site field servicing calls are closed to insure customer satisfaction.
- Demonstrates commitment to Stratasys Core Values by leading, acting and behaving in a manner consistent with these values.
- Follows all company safety policies and procedures…
- Provides service training for new customers at customer facilities.
- Records customer-related field activities in customer service call tracking software application to insure accurate information on customer base.
- Maintains service inventory using established protocols and controls.
- Reports back to Stratasys corporate office concerning service calls completed timely and accurately; responsible for timely submission of expense reports and other service-related paperwork as required. ***

(Docket No. 33-1 at 15-16.)

19.    Ninety-five percent (95%) of Plaintiff's "primarily duties and responsibilities on a typical workday and workweek basis" were new installations and maintenance on existing 3-D printer products.  (Docket No. 33-1 ¶ 11.)

20.    Plaintiff's work hours varied based on the customer's hours, his travel and other elements.  (SOF ¶ 46.)

5

Customer Interaction

21.　King would inform Plaintiff what customer he would need to visit through populating an Outlook calendar event.  (SOF ¶ 21.)

22.　Plaintiff would then decide to fly or drive to the customer based on the distance from his home.  (SOF ¶ 24.)  Stratasys never questioned Plaintiff's decision to fly or drive.  (Docket No. 50 at 7.)

23.　Plaintiff would email King when he left home and provide an estimated arrival time at the customer site.  (SOF ¶ 21.)

24.　Plaintiff did not contact other FSEs for questions or guidance and enjoyed working "on [his] own".  (Docket No. 50 at 7.)

Administrative Duties

25.　In August 2012, Plaintiff testified he spent an average of 10 to 12 hours a week on administrative tasks, two to three hours of which were on the weekend.  (SOF ¶ 57.)    In March 2013, Plaintiff testified he spent an average of three to four hours working on the weekend.  (Id.)

26.　On direct examination, Plaintiff testified he spent an average of two to three hours per *week* preparing to travel.  (SOF ¶ 58.)  On cross examination, Plaintiff testified he spent an average of two to three hours per *day* on this task.  (Id.)

27.　Plaintiff spent two to three hours preparing for a customer visit by gathering information such as case data (list of pre-shipped parts), case history and

customer information.   (Docket No. 50 at 9.)   Plaintiff spent approximately 30-60 minutes reviewing a customer file prior to a visit.  (SOF ¶ 34.)

28.   Following a customer visit, Plaintiff was required to detail his actions taken to resolve the customer's problem into SalesForce.  (Docket No. 50 at 10.)  On direct examination, Plaintiff testified that it "varied" from 30-60 minutes to enter customer information, and he typically visited two to four customers per week.  (SOF ¶ 56.)  On cross examination, Plaintiff testified he spent four to five hours a week on this same task (equating to visiting four to ten customers per week).  (SOF ¶ 56.)

29.   Plaintiff spent six to eight hours per month working on expense reports. (SOF ¶ 34.)  When performing this administrative duty, Plaintiff testified that he was being an accountant as he was required to code his expenses with the general ledger code in Stratasys' accounting books.  (Docket No. 151-6 at 41:16 – 42:23.)

Installation Duties

30.   Plaintiff spent approximately ten percent (10%) of his time installing new 3-D printers at customer sites.  (Docket No. 50 at 8, 9.)  It is "too difficult" for a customer to install a 3-D printer, which takes about two (2) days.  (Docket No. 50 at 8.)

31.   Although Stratasys provided Plaintiff with installation checklists, Plaintiff would not always follow them; rather, he would perform the installation of the 3D printer his own way and verify at the end that he did everything.  (Docket No. 50 at 8; SOF ¶ 37.)

32.     New 3D printers could arrive at the customer "dead on arrival" and need

immediate troubleshooting:

> **Q.  What takes so long to figure out or how do you go about figuring
>      out what manufacturing screwed up?**
> A.  A process of troubleshooting.
> **Q.  How do you know where to start looking?**
> A.  Just my knowledge.
> **\*\*\***
> A.  I can't explain it to you.

(Docket No. 50 at 8.)

33.     After a new installation, Plaintiff spent four to six hours training Stratasys'

customers how to operate the machine, change material and change tips.  (Docket No. 50

at 9.)

34.     Plaintiff returned to the customer site the following day to ensure the 3D

printer was working and address any remaining customer questions.  (Docket No. 50 at

9.)

Troubleshooting

35.     Plaintiff spent approximately ninety percent (90%) of his time on customer

maintenance issues.  (Docket No. 50 at 9.)  A 3D model may: "[c]ome out in a form that

it wasn't supposed to, [have] problems related to extrusion where the machine is

extruding the material to build it, under extrude, over extrude, not extrude at all."  (Id.)

Extrusion is where heated material is forced out of a tip in a pattern resulting in a 3-D

product.  (Id.)

8

36.     A 3-D printer can have "endless" problems:

**Q.  Does [the printer] have to be controlled as well like temperature or humidity or not?**
A.  Yes, temperature.
**Q. …How do you maintain the temperature in this box?**
A.  Heating elements, thermal sensors, temperature sensors.
**Q.  Okay.  That's part of something you need to check as well?**
A.  Yes.
***
**Q.  Are there any other elements controlled other than temperature?**
A.  Air pressure.
**Q.  Air pressure in the box?**
A.  Air pressure in a drying system.  Air pressure to create vacuum in the box.
**Q.  So what happens if that's not working properly?**
A.  If the vacuum is not working the machine will not work.
**Q.  Okay.  A customer calls and says my machine doesn't work, it could be a cable, it could be the vacuum, it could be the temperature.  What other things could it be?**
A.  It could be the computer.  It could be a power board, a broken belt, a multitude of problems and reasons.
**Q.  How do you know where to start?  On a maintenance problem, somebody calls and says this isn't printing, how do you know where to start?**
A.  Instinct.
**Q.  Okay.  Do you have a general pattern or a way that you have kind of found works for you best?  Is there certain parts or processes that typically break or is it literally all over the board?**
A.  Some break more than others.  You have to look at the symptoms.
**Q.  How many symptoms can there be?**
A.  Thousands.  It's endless.  It's like your body.  How many things can go wrong in there and how do you fix them?

(Docket No. 51-1 at 35-36.)

37.     Occasionally, Plaintiff would arrive at a customer and need to order a part for a broken 3-D printer; he would create a temporary fix (such as bypassing a circuit)

then go back to the hotel and wait for the overnight package to arrive.  (Docket No. 50 at

10; SOF ¶¶ 43, 46.)

Alleged Damages

38.     Plaintiff is consistently inconsistent in his testimony regarding his

"approximation" of hours worked (often depending on who is asking the question):

| Testimony | Date | Direct or Cross Examination |
|---|---|---|
| "45/50/55/60 hours a week" | 8/15/12 | Plaintiff's anonymous 2/8/12 email sent to co-workers; verified on direct examination |
| "62 to 70 hours" on average a week | 8/15/12 | Cross |
| "Somewhere between 60 and 70 hours a week on average" | 3/6/13 | Direct |
| "61 to 70 hours a work week" | 3/6/13 | Cross |
| 70 hours "minimum" | 3/6/13 | Cross |
| "at least 61 hours during the work week on average" | 3/6/13 | Cross |
| "62 to 70" | 3/6/13 | Re-direct |
| "I worked approximately 60 hours a week."; "Jarvis and I worked on this number together and came up with it as a reasonable approximation" | 7/18/13 | Direct |
| "on a weekly average I worked 20 hours in excess of 40" | 7/18/13 | Direct |

(SOF ¶ 55.)

39.     Plaintiff's employment with Stratasys terminated on February 15, 2012.

(SOF ¶ 15.)

40.     From April 24, 2009 to February 15, 2012, Plaintiff's weekly salary was

$907.02.  (Docket No. 132-1 at 6.)   From March 1, 2010 to April 3, 2011, Plaintiff's

weekly salary was $927.48.  (Id. at 7.)  From April 4, 2011 to February 15, 2012, Plaintiff's weekly salary was $958.92.

41.    Plaintiff alleges he is owed "approximately" $91,498.40 for 131 weeks of overtime (based on 3 years of backwages), and with liquidated damages, he seeks $182,997 plus attorneys' fees.  (SOF ¶ 52, FN 5.)

42.    Plaintiff does not know and cannot "describe or identify…in detail every minute of every day that Plaintiff worked for Stratasys, but was not properly compensated, including the total amount of unpaid time for each day and type of hours not compensated (i.e., straight time, overtime).  Further…I do not have any documents in my possession or under my control that would identify any of my overtime hours while employed at Stratasys."  (Docket No. 140-2 at 3, 23.)

43.    In July 2013, Plaintiff confirmed he did not estimate his hours worked and related damages using any documents, and that his attorney drafted the "approximation" at Attachment A (Docket No. 132-1 at 6):

> **Q.  And below that it says weekly approximate total hours worked, the @ sign, 60 hours per weekly, what does that mean?**
> A.  That means I worked approximately 60 hours a week.
> **Q.  And would that be during which time period?**
> A.  From April 24th, 2009 to February 15, 2012.
> **Q.  And upon what information did you rely in making th[e] calculations?**
> A.  Mainly just recollection of my daily activities
> \*\*\*
> **Q.  And how much per day did you attribute to those activities outside the normal work day?**
> A.  I didn't do it on a per day basis.
> **Q.  Why not?**

11

A.  It was too hard to do, too hard to - - I couldn't remember daily activities by day by day.

**Q.  Is it your testimony that you did the same job work activities each and every week from that wage period covered?**

A.  No, it varied.

\*\*\*

**Q.  So how did you come up with the 60?**

A.  It was just an approximation and probably believe that it was a conservative approximation.

**Q.  Are you aware that's the same amount of hours as Chuck Longlois?**

A.  No, I am not.

**Q.  And is this the number that you came up with?**

A.  Yes, [Attorney] Jarvis [Jones] and I worked on this number together and came up with it as a reasonable approximation.

**Q.  And what documents did you look at when you were coming up with that approximation?**

A.  There were really no documents to support this approximation.

(July 18, 2013 Deposition of Gregory Holaway attached to November 7 Affidavit of Corie J. Tarara ("Tarara Aff") ¶ 2, Ex. A at 279:22 – 282:7.)

## II.    LEGAL ANALYSIS.

### A.    SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the burden to make this showing.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'  Fed.Rule Civ.Proc. 1."  Celotex Corp., 477 U.S. at 327.

The Court may consider only admissible materials or those useable at trial, and may not rely on hearsay.  Walker v. Wayne County, Iowa, 850 F.2d 433, 434-35 (8th Cir. 1988).  The Court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmovant.  Hayek v. City of St. Paul, 488 F.3d 1049, 1054 (8th Cir. 2007).  However, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

## B.   THE FLSA'S BURDEN SHIFTING.

The FLSA entitles an employee who works in excess of forty (40) hours in a single workweek to one-and-a-half times his regular rate of pay for any hours over 40 ("overtime").  29 USC § 207(a)(1).  However, the FLSA exempts individuals from the overtime requirement who are employed "in a bona fide executive, administrative, or professional capacity".  29 U.S.C. § 213(a)(1).

### 1.   Plaintiff Bears the Initial Burden to Prove He Worked More than 40 Hours.

An employee who sues for unpaid overtime under the FLSA bears the initial burden to show that he "performed work for which he was not properly compensated." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946).  To meet this initial burden the plaintiff must prove, by a preponderance of the evidence, evidence indicating he worked over forty (40) per week.  Carmody v. Kansas City Bd. of Police Com'rs, 713 F.3d 401, 406 (8th Cir. 2013) (Anderson test only applies when damages is certain); Dole

v. Tony & Susan Alamo Found., 915 F.2d 349, 351 (8th Cir. 1990) (plaintiff must provide evidence of uncompensated work before burden shifts); Sharp v. Warner Holding Co., 1972 WL 1064, * 2 (D. Minn. 1972) (Larson, J.) (correct to measure plaintiff's evidence "whether they worked more than forty hours by the preponderance of the evidence test").

The "preponderance of the evidence" test requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence" by evaluating "the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty". Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust for S. California, 508 U.S. 602, 622-23 (1993). The "evidence to sustain this burden must be definite and certain." Johnson v. Dierks Lumber & Coal Co., 130 F.2d 115, 118 (8th Cir. 1942).

2.      The Burden Then Shifts to the Employer to Prove an Exemption Applies.

If Plaintiff cannot prove he worked over 40 hours, then summary judgment is proper. Carmody, 713 F.3d 401 (the "complete failure to prove an essential element of the [Plaintiff's] case 'renders all other facts immaterial.'"). If a plaintiff is able to provide the requisite proof of uncompensated labor by a preponderance of the evidence, the burden then shifts to the employer to establish that he was properly classified under an exemption to the FLSA overtime requirements. Id. If the employer can establish that the plaintiff was exempt from overtime, his claim fails.

14

3. <u>If the Employer Fails to Prove an Exemption Applies, the Burden Shifts Back to the Employee to Prove He Performed Uncompensated Work.</u>

If the employer fails to establish that the plaintiff was properly classified, then the court must determine "whether there is a reasonable basis to calculate damages". <u>Brown v. Family Dollar Stores of IN, LP</u>, 534 F.3d 593, 596 (7th Cir. 2008) (citing <u>Anderson</u>, 328 U.S. at 687).  Under <u>Anderson</u>, if "an employer fails to maintain accurate time records, Anderson relieves the employee of proving the precise extent of uncompensated work and creates a relaxed evidentiary standard." <u>Carmody</u>, 713 F.3d at 406.  Thus:

> Under this relaxed evidentiary standard, once the employee has proved he performed uncompensated work for which he was not compensated and 'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference' the burden then shifts to the employer to produce evidence to dispute the reasonableness of the inference'. <u>Anderson</u> only applies where the existence of damages is certain. <u>Anderson</u> allows only for the amount of damages.

<u>Id.</u> (citations omitted).  An employer's failure to provide accurate time records reduces the plaintiff's burden, "but does not eliminate it"; the plaintiff "must still prove the existence of damages".  <u>Id.</u>  (granting summary judgment for employer where the employees failed to provide any evidence of damages – hours worked over forty (40) hours worked in a workweek that they did not receive overtime.)  As detailed below, Plaintiff cannot meet his burden to prove by a preponderance of the evidence that he worked more than 40 hours or that he has any damages that can be calculated by a just and reasonable inference.

15

**C.    PLAINTIFF CANNOT OVERCOME HIS INITIAL BURDEN TO PROVE THAT HE WORKED MORE THAN 40 HOURS IN A WORKWEEK.**

Plaintiff's claim falls at the first hurdle as he cannot prove, by a preponderance of the evidence, that he worked more than 40 hours in the workweeks that he alleges he is owed overtime.  Sharp, 1972 WL 1064.  Further, Plaintiff has no "definite and certain" evidence of wages due for overtime hours to prevail on such a claim.  Johnson, 130 F.2d at 118 (citing Jax Beer Co. v. Redfern, 124 F.2d 172 (5th Cir. 1941) (refusing to uphold findings and judgment "upon the guess, speculation, and averages made up" from uncertain recollections).

It is uncontroverted that Plaintiff's testimony regarding his alleged hours worked changes so often not only is it not "definite and certain", it is about as indefinite and uncertain as it can get – so much so that he even refuses to lock in his alleged "approximate" 60 hours by testifying that, while that is the number arrived at with his attorney, he still thinks that is conservative.  Such testimony is insufficient as it makes it difficult for a trier of facts to determine what evidence is "true and accurate".  Bernick v. Coddon, 65 F. Supp. 89, 92 (D. Minn. 1946) (Donovan, J.).  For example, in an anonymous email he wrote to his fellow FSEs prior to the lawsuit (and while still employed), he alleges to his colleagues that he works "45/50/55/60" hours per week.  Yet, during his deposition testimony he ranged all the way up to 70 hours "minimum" and eventually decided to allege he worked an average of 60 hours ("conservatively")

16

after consultation with his attorney, and without using any documents to support his approximation.[2]

Additionally, despite Plaintiff's testimony that his weekly hours, customer visits and travel varied, Plaintiff claims he worked approximately 60 hours each week regardless of whether he took vacation or holiday in a week.  Plaintiff admits he has no idea of the amount and extent of overtime he alleges he worked, and that he used no documentation to determine his 60 hour alleged workweek.  Thus, he has "produced no evidence from which the court can draw a 'just and reasonable inference,' and [the] claim for unpaid overtime compensation fails."  Mellon v. Hospice Preferred Choice, Inc., No. 09-932, 2011 WL 70612, * 2-3 (D. Minn. Jan. 10, 2011) (Doty, J.) (analyzing Minnesota FLSA under Anderson); see also Carmody, 713 F.3d at 406; Bernick, 65 F. Supp. at 91 (memories can be inaccurate and it can be "ludicrous…to be positive and empathetic about remote incidents and material facts, in the absence of supporting written records"); Jax Beer Co., 124 F.2d at 175 (an "average" number of hours worked is insufficient to meet this burden).

Furthermore, Plaintiff cannot attempt to shift the burden prematurely by arguing that no timekeeping records exist, and to the extent documents were produced which

---

[2] Plaintiff has no means to "cure" his failure to provide sufficient and precise evidence during the discovery phase of the litigation.  Due to Plaintiff's failure to provide damages calculations and the basis for their calculations until the eleventh hour of discovery, this Court sanctioned Plaintiff, ordering that "Plaintiffs are precluded from changing their damage calculations or the basis for their calculations at trial, as set forth in their supplemental answers to Interrogatories Nos. 1 and 3 and Supplemental Initial Disclosure No. 3".  (Doc No. 145 at 14-15.)

show work was performed (such as SalesForce or Whitespace), such records are inadequate or inaccurate.  Carmody, 713 F.3d at 406 (deposition testimony, interrogatory answers and an employer's report are not "evidence indicating any hours worked over forty hours per week" were unpaid and employee must still provide evidence of "actual damages"); DiSantis v. Morgan Properties Payroll Services, Inc., 2010 WL 3606267, *12-15 (E.D. Penn. 2010) ("vague, speculative, and unsupported testimony would make it impossible for a reasonable jury to even approximate damages"; summary judgment proper where employee asserts employer's records were incomplete and inaccurate and yet whose own testimony was "scattered and inconsistent").

    Without any admissible evidence that Plaintiff worked a single hour over 40, his unsupported "approximation" of hours unpaid hours is insufficient and his claim summarily fails.  See Carmody, 713 F.3d at 407; Espenscheid v. DirectSat USA, LLC, 705 F.3d 770, 774-5 (7th Cir. 2013) (Posner, J.) (even when time records are incomplete, plaintiffs are not excused from their burden to establish the amount of unreported time); Moschos v. Creighton University, 2013 WL 3005560, * 4-5 (D. Neb. June 4, 2013) (plaintiff's "belief" that hours worked during one time period would be similar to others, but provided "no evidence of actual hours worked, or money owed, for the relevant period" held insufficient).

    As Plaintiff cannot prove by a preponderance of the evidence that he has worked overtime hours, the Court need not reach the question of whether his "approximation" of

overtime hours was "sufficiently precise" under <u>Anderson</u> as the claims necessarily fail, and thus, dismissal is proper. <u>Sharp</u>, 1972 WL 1064, *1-2.

## D. PLAINTIFF IS EXEMPT FROM THE FLSA'S OVERTIME REQUIREMENTS.

In addition and/or in the alternative, if Plaintiff is able to prove that he worked more than 40 hours per workweek, the burden shifts to Stratasys to show that he was properly classified under an FLSA exemption. <u>Dole</u>, 915 F.2d at 351-2. As detailed below, Plaintiff is not entitled to overtime compensation under the FLSA as he was employed in a bona fide administrative capacity or combined exemption.

Pursuant to 29 U.S.C. § 213(a)(1), the Secretary of Labor ("Secretary") has defined these terms, and thus, delineated the types of employees falling within these exemption categories. <u>See</u> 29 C.F.R. pt. 541; <u>Fife v. Harmon</u>, 171 F.3d 1173, 1175-76 (8th Cir. 1999). In order to determine whether an employee is exempt from overtime, the Court must make a fact-intensive inquiry into the plaintiff's daily activities and responsibilities and then apply the Secretary's requirements. <u>Reich v. Avoca Motel Corp.</u>, 82 F.3d 238, 240 (8th Cir. 1996). Accordingly, while the employee's duties are questions of fact, the ultimate question of whether an employee is exempt is an issue of law for the Court. <u>McAllister v. Transamerica Occidental Life Ins.</u>, 325 F.3d 997, 1001 (8th Cir. 2003); <u>Jarrett v. ERC Props., Inc.</u>, 211 F.3d 1078, 1081 (8th Cir. 2000).

1.    <u>The Administrative Exemption</u>.

The Secretary has established a general rule at 29 C.F.R. § 541.200(a) to determine when an employee is "employee employed in a bona fide administrative capacity" and thus falls under the administrative exemption:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week…;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).[3]   As detailed below, Plaintiff's duties for Stratasys squarely fit within the administrative duties and he is not entitled to overtime in any event.

a.    <u>Sufficient Compensation</u>.

As Plaintiff's weekly salary was almost twice the required $455 per week, the first prong is satisfied.  29 C.F.R. § 541.200(a)(1).

b.    <u>Performance of Work Related to Business Operations</u>.

The second prong provides that the employee's primary duty (the "principal, main, major or most important duty") must be the "performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers".  29 C.F.R. §§ 541.200(a)(2); 541.700(a).  The terms "office" or

---

[3] As Plaintiff's weekly wage was not less than $250, the "short duties test" as set forth in 29 C.F.R. § 541.200(a) may be used.  29 C.F.R. § 541(e)(2).

"non-manual" work refers to "white collar" employees – not whether the individual actually works in an office.  29 C.F.R. § 541.203(a); Lutz v. Ameritech Corp., 208 F.3d 214, * 2 (6th Cir. 2000) (use of diagnostic tools to analyze problems and implement solutions and manual installation of computer equipment and software is non-manual work); Koppinger v. American Interiors, Inc., 295 F.Supp.2d 797, 800-802 (N.D. Ohio 2003) (physical actions such as installing hardware and software does not negate exemption given prominence of problem-solving and other duties related to maintenance, upgrading and administrating computer system).

In Cruz v. Lawson Software, Inc., 764 F. Supp. 2d 1050, 1066-67 (D. Minn. 2011) (Davis, C.J.), the named plaintiff consulted with the employer's customers to improve and configure their software – not as an IT help desk would, but as a problem solver who would implement solutions to benefit the customer's operations.  The Cruz court held that such duties constitute non-manual labor that affects customer operations to a substantial degree and is therefore exempt.  Another Cruz plaintiff was held exempt who testified that his primary duties "included providing subject matter expertise and training to customers, and installing, maintaining and upgrading software and/or databases, operating systems, software, system administration, hardware configurations and networks in implementing products for [the employer's] customers."  Id.

Similar to the plaintiff in Cruz, Plaintiff's primary job duties included hardware/software installation and consulting with and problem solving for Stratasys' customers, training, and knowledge transfer to Stratasys' customers.  Id. at 1069.

21

Plaintiff's direct work with customers, being the face of Stratasys and training them, is the performance of work related to business operations.

Plaintiff testified that he had to possess good troubleshooting and diagnostic skills and that his essential duties and responsibilities consist of: installing, diagnosing, repairing Stratasys' hardware and software; providing preventative maintenance of hardware and software; calling customers following on-site work; training new customers at the customer's site; record field activities; maintain service inventory; and report completion of service calls and related expenses.  Similar to <u>Cruz</u>, Plaintiff was a problem solver who was trusted to perform the above duties alone at the customer's site. <u>Cruz</u>, 764 F. Supp. 2d at 1066-67.

Plaintiff testified he cannot even explain how he would troubleshoot a malfunctioning 3D printer as he would just know where to start based on his knowledge. Plaintiff testified that his ability to diagnose a multitude of problems and endless symptoms was by "instinct".  This is different than that of an IT worker who simply maintains a computer system or performs routine software installations.  <u>Cruz</u>, 764 F. Supp. 2d at 1066-67 (distinguishing employees who perform hardware/software work that is comprehensive in nature and ranges from investigating problems to considering and implementing solutions to solve the problem).

Typically, the employee must spend at least fifty percent (50%) of their time performing exempt work as a primary duty to qualify for an exemption.  29 C.F.R. § 541.700(b); <u>McAllister</u>, 325 F.3d at FN 3.  The type of work performed must be directly

related to "assisting with the running or servicing of the business as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment" or the "general business operations of the employer's customers" (such as employees acting as consultants to the employer's customers).  29 C.F.R. § 541.201(a), (c).  Plaintiff's typical work day consisted of performing maintenance (85% of the day) and installations (10% of the day) at customers' work premises, working alone supporting or servicing Stratasys' business.  Accordingly, Plaintiff's primary duty was the performance of non-manual work, directly related to the general business operations of Stratasys.

c.  <u>Discretion and Independent Judgment</u>.

As to the third prong, whether an employee exercises "discretion and independent judgment with respect to matter of significance" generally "involves the comparison and evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered" and is viewed "in the light of all the facts involved in the particular employment situation".  29 C.F.R. § 202(a), (b).  Some factors to consider are:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business…whether the employee has authority to waive or deviate from established policies and procedures without prior approval ….whether the employee investigates

23

and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 202(b).

While this "implies that the employee has authority to make an independent choice, free from immediate direction or supervision", it is sufficient "if their decisions or recommendations are reviewed at a higher level". 29 C.F.R. § 202(c). Further, the use of manuals, guidelines or other establish procedures does not preclude exemption. 29 C.F.R. § 541.704; see also McAllister, 325 F.3d at 1001 (requirement to follow detailed manuals does not equate to the failure to exercise discretion and independent judgment); Dymond v. United States Postal Serv., 670 F.2d 93, 95-96 (8th Cir. 1982) (being required to follow procedures, standards and policies of a detailed field manual does not defeat the exemption as employees where employees must still use good common sense judgment).

Plaintiff unquestionably meets this prong. He worked out of his home, traveled across the country, and communicated with a single individual at Stratasys. Once plaintiff received notification of a customer visit through Outlook, he was solely responsible to: review the customers' history; plan and coordinate his travel; go to the customer site; troubleshoot, diagnose and resolve any problems; train and educate the customer; ensure customer satisfaction; report in the Sales Force software the outcome of the trip and what was done; and then return home or go to the next customer based on his schedule and location. Plaintiff was not only independent, but virtually unsupervised.

Again, these facts are consistent with <u>Cruz</u>, where the Court found that this prong was met when the employee implemented the employer's software at a customer and assisted the customer with training, troubleshooting and modification of the software. <u>Cruz</u>, 764 F. Supp. 2d at 1067-68; <u>Verkuilen v. Mediabank</u>, 2010 WL 3003860, at *1–*2 (N.D.Ill. July 27, 2010) (employee was exempt where she provided service and support to software customers, exercised discretion to determine the nature of a software problem and how to handle it, and trained users and modified the user manual, even though she had company policies to follow).

Similar to <u>Cruz</u> and <u>Verkuilen</u>, Plaintiff also used independent judgment when troubleshooting, problem solving, and diagnosing problems for Stratasys' customers. Further, the fact that Plaintiff used manuals, guides, checklists or procedures for preventative maintenance and installations does not preclude the finding that he used discretion and independent judgment, especially where the far majority of his duties was problem solving broken 3D printers by using his instinct and diagnostic and troubleshooting skills.  <u>McAllister</u>, 325 F.3d at 1001.

Like <u>Cruz</u>, Plaintiff testified that there could be "endless" amount of things wrong with a 3D printer and that he was creative in performing his job duties.  At the end of the job, Plaintiff would simply make sure he did everything on the checklist.  <u>Cruz</u>, 764 F. Supp. 2d at 1067-70 (plaintiff Cruz worked independently to address multiple variables and problems during the installation; regularly had to deviate from installation guides and use his industry knowledge, skill, and experience to read into the manual and figure out

the problem; plaintiff Winn noted there could be an "infinite" number of installation configurations and that his duty was to give advice to the customer; he worked independently and only communicated with his supervisor every few weeks); see also Harber v. HEBCO, Inc., 146 P.3d 876, 879-880 (Okla.Civ.App. 2006) (employee exempt where responsible for maintaining computer information systems, working with users of the system by troubleshooting, fixing or replacing software, upgrading hardware and software, performing upgrades, and diagnosing problems).

Likewise, in Koppinger v. American Interiors, Inc., 295 F.Supp.2d 797, 802 (N.D. Ohio 2003), the employee was held to be administratively exempt where position was to maintain, upgrade and administer a computer system:

> While some of his work may be considered manual in that he necessarily had to perform some physical actions (installing hardware/software, etc.), those actions do not negate the exemption because plaintiff's deposition testimony establishes the prominence of the problem-solving, planning, and purchasing duties….Plaintiff's work, furthermore, was comprehensive in nature, and ranged from investigating problems, to considering possible solutions and implementing, in plaintiff's opinion, the best solution.

Similarly, Plaintiff performed physical actions such as installing hardware and software, but that does not negate the fact that 85% of his job was troubleshooting, problem-solving and interfacing with the customer, alone, to solve their problem with the 3D printer to their satisfaction.  See also Lutz, 208 F.3d 214 (Field Engineer that analyzed network problems with diagnostic tools, manually installed various computer equipment and software, and designed and oversaw company network access, was administratively

exempt as his duties called for independent judgment and discretion, even though he relied on manuals and documents).

In Carbaugh v Unisoft Inter., Inc., 2011 WL 5553724, * 22-23 (S.D. Tex. 2011), the employee was held exempt where he was responsible for demonstrating complex software to potential customers; went to customer sites; consulted with customers to assess needs and capabilities; installed and tailored software to suit customers' needs; trouble shot problems; trained customers; worked with employer's programmers to provide information needed to produce software to suit customer needs; verified the software performed as needed; installed and adopted software program or oversaw and instructed customer on how to install program; and was the only representative of the employer at the customer site.   The Carbaugh court held the employee (much like Plaintiff):

> was neither a salesman nor a technician sitting at a phone bank fielding random calls from his employer's customers.  Instead, he traveled – alone – to the customer's location for the installation, testing, and initial operation of the customer's…software.  As the intermediary between the employees of the customers….he had to identify customer needs, translate them into specifications to be implemented, and assist in the implementation. Moreover, [the employee] had to spend much, if not most, of his time away from the employer's offices on the premises of the employer's customers.

See also Smith v. Johnson and Johnson, 593 F.3d 280 (3rd Cir. 2010) (employee exempt where required to travel to customers, unsupervised 95% of the time; had the ability to do the work the way she wanted to; wrote pre-visit and post-visit reports; drove to customers, met with customers, and completed other administrative tasks); Paul v. One

Touch Technologies Corp., 2007 WL 1786259 (Cal. Ct. App. June 21, 2007) (Field Support Representative held exempt where he was a troubleshooter for employer's software; worked at home or customer's facility; performed initial installations; was on his own to perform function and report back to customer; and was free to do personal business when not working during the workday.)   Plaintiff cannot escape his own testimony that his job duties consist of initial installation of hardware and software; problem diagnosis (troubleshooting); emergency and preventative maintenance; on-site customer support; traveling alone from his home office and working alone; training customers; and doing personal business when not at a customer's site.  Accordingly, as an exempt employee, Plaintiff is not entitled to overtime and summary judgment is proper.

### 2.  Combined Exemption.

In the alternative, the Secretary allows employees who do not meet any single exemption (*i.e.,* executive, administrative, professional, outside sales and computer), but yet whose primary duties are exempt duties, to qualify for a combined exemption.  29 C.F.R. § 541.708 (2011).  The regulations thus allow the "cobbling together" of different exempt duties for the purpose of meeting the primary duty test.  Schmidt v. Eagle Waste & Recycling, Inc., 598 F.Supp.2d 928, 937 (W.D. Wis. 2009) (citing IntraComm, Inc. v. S. Bajaj, 492 F.3d 285, 294 (4th Cir. 2007)).  This is akin to the "Duck Test" (changed over time and perhaps initially attributable to author James Whitcomb Riley): if it walks like a duck, quacks like a duck and looks like a duck, it has got to be a duck.  Eisenrich v. Minneapolis Retail Meat Cutters & Food Handlers Pension Plan, 544 F.Supp.2d 848, 858

(D. Minn. 2008) (Kyle, J.), aff'd, 574 F.3d 644 (8th Cir. 2009).  In this regard, the Secretary allows courts to recognize a duck when they see one.

Some of Plaintiff's duties, if not administrative, could very well fall under the computer professional exemption, which provides that the primary duty must consist of one or more of the following:

> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications; (2) The…documentation, analysis…testing, or modification of computer systems or programs…based on and related to user or system design specifications; (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or (4) a combination of the aforementioned duties, the performance of which requires the same level of skills.

29 C.F.R. § 541.303(b)(1)-(4).  As noted above, Plaintiff's job duties consist of installing, maintaining, repairing, troubleshooting and diagnosing Stratasys' 3D printing hardware and software.  He must test the printers prior to leaving the customer, and may make modifications (albeit temporary) while waiting for a part to arrive.

Plaintiff also likens himself to a professional (an accountant), testifying that FSEs are "being accountants" as they must code their expenses with a general ledger code. Thus, by Plaintiff's own testimony, he spends approximately six to eight hours per month being an accountant.  Accordingly, Plaintiff's duties, taken in the totality, certainly are that of a white collar, exempt employee.

**E.     PLAINTIFF CANNOT MEET HIS BURDEN TO SHOW THE EXTENT OF OVERTIME ALLEGEDLY WORKED.**

In addition or in the alternative, Plaintiff must still prove his damages under the Anderson burden-shifting paradigm.[4]   Marshall v. Truman Arnold Distributing Co., 640 F.2d 906, 911 (8th Cir. 1991).   Plaintiff must produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference".   The Anderson burden shifting factors provide:

> [A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.   The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.   If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

Anderson, 328 U.S. 680 at 687.   If Plaintiff is able to show that he worked more than 40 hours and the Court concludes he might have been misclassified, then the "just and reasonable inference" test set forth in Anderson applies "only to the question of whether plaintiffs have shown with sufficient certainty the amount of overtime worked."   Sharp, 1972 WL 1064.

---

[4] On June 16, 2013 the Court issued its Order on Defendant's Motion for Sanctions to Dismiss Action for Failure to Obey Discovery Rules and Orders (Docket No. 145), which orders that "Plaintiffs are precluded from changing their damage calculations or the basis for their calculations at trial, as set forth in their supplemental answers to Interrogatories Nos. 1 and 3 and Supplemental Initial Disclosure No. 3".   (Id. at 15.)

Plaintiff has no documents to prove the amount of overtime hours he allegedly worked, let alone materials usable at trial as required by Walker.  850 F.2d at 434-35. This is certainly a calculated tactic, merely a continuation of Plaintiff's gamesmanship and unusual delay tactics.  As summarized by the Court's April 12, 2013 Order awarding attorneys' fees to Stratasys:

> The Court noted that plaintiffs had taken the position from the outset that they needed information from defendant to calculate their damages, but failed to serve discovery or take a Rule 30(b)6 deposition in a timely way so as to be able to obtain the information necessary to supplement their responses and provide time for defendant to conduct its own discovery based on the supplemented responses.

(Docket No. 122 at 5.)  And again, on June 17, 2013, the Court recapped the situation – Plaintiff, throughout the litigation, claimed he could not provide a damage calculation without documents from Stratasys.   The Court recognized that Stratasys provided Plaintiff with his payroll records, paid time off and holiday records, Whitespace records and Outlook records.   (Id. at 2, 6).   Yet, Plaintiff still refused to base his estimated damages on any of the documents provided by Stratasys arguing that they were "irrelevant, inaccurate and provided little or no aid" to assist Plaintiff to determine his total regular hours or overtime hours.  (Id. at 7).  As Stratasys pointed out in that hearing, Plaintiff could have used those documents to calculate his damages and then filled in any gaps with his own recollection about the time he worked that was not reflected in the documents.   (Id. at 3.)   Yet, as the Court acknowledged, Plaintiff's damages approximation "was largely based on plaintiffs' personal recollections of their overtime".

(Id. at 7.)  The Court held that while Plaintiff answered the interrogatories, reliance on memory alone and refusal to use Stratasys' business records "goes to the weight of the evidence".   Accordingly, even under the relaxed Anderson standard, Plaintiff has made the deliberate choice to rely on his memory alone (which is less than consistent as detailed above), failing to provide any evidence of the amount and extent of work that he was owed but not paid.  Thus, Plaintiff cannot met his burden.

## F.   DAMAGES ARE CALCULATED BASED ON THE FLUCTUATING WORKWEEK METHOD FOR THE PAYMENT OF OVERTIME.

In the alternative, if this Court allows Plaintiff's claim for overtime to proceed, Plaintiff's claim for damages at 1.5 times his regular rate should be denied.  The FLSA requires employers to pay hourly employees one hundred and fifty percent (150%) of an employee's "regular rate" for each hour of overtime.  29 U.S.C. § 207(a).  However, 29 C.F.R. § 778.114 provides that when a non-exempt individual is paid a fixed salary, overtime wages are "calculated by taking all hours worked beyond forty multiplied by one-half of the weeks' "regular rate".  Soderberg v. Naturescape, Inc., No. 10-3429, Mem. and Order, No. 10-3429 at p. 7 (D. Minn. November 3, 2011) (Magnuson, J.) (attached to September 7, 2012 Affidavit of Gregory L. Peters at Docket No. 42-6); Ahle v. Veracity Research Co., 738 F.Supp.2d 896, 918 (D. Minn. 2010) (Montgomery, J.). This is commonly referred to as the fluctuating workweek ("FWW") method for the payment of overtime.  Ahle, 738 F.Supp.2d at 918; see also July 15, 2013 Expert Report of Alexander J. Passantino attached to Tarara Aff. ¶ 3, Ex. B at 2-4).

32

In a misclassification case, the individual has been paid a fixed salary, and thus, the measure of damages, if any, is based on the FWW.  Fenton v. Farmers Ins. Exchange, 663 F.Supp.2d 718, 728 (D. Minn. 2009) (Tunheim, J.); see also Valerio v. Putham Assoc. Inc., 173 F.3d 35, 40 (1st Cir. 1999); Cash, 2 F.Supp.2d at 896 (damages are "equal to the difference between the amount resulting from the correct calculation of overtime compensation using the fluctuating workweek method and the amount of overtime compensation actually paid.").  Accordingly, Plaintiff's claim for damages, if any, should be limited to one-half of his regular rate for any overtime hours.

## G.    A TWO YEAR STATUTE OF LIMITATIONS APPLIES.

FLSA violations are subject to two-year statute of limitations.  See 29 U.S.C. § 255(a).  This may be extended to three years if an employer's violation is "willful" (i.e., it either "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA").  McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); see also Hanger v. Lake County, 390 F.3d 579 (8th Cir. 2004); Jarrett, 211 F.3d at 1080-82.  Plaintiff bears the burden of showing that Stratasys' conduct was willful.  Fenton, 663 F.Supp.2d at 728 (Tunheim, J.); Smith v. Heartland Automotive Services, Inc., 418 F.Supp.2d 1129, 1141 (D. Minn. 2006) (Kyle, J.).  Plaintiff must come forward with more than the fact that an employer failed to properly classify an employee and that the employer produced no documents evidencing the classification decision.  Fenton, 663 F.Supp.2d at 728.  Plaintiff has not done so.

In fact, where an employer uses a computer program to track the availability of its employees and dispatch employees (such as Whitespace), such use, when not used for payroll purposes, is not a basis for constructive knowledge of overtime work.  Hertz v. Woodbury County, Iowa, 566 F.3d 775, 781-82 (8th Cir. 2009).  The "willful" violation contemplates something more.  For example, an employer's violation of the FLSA is "willful" where supervisors specifically instructed hourly employees not to record overtime.  Jarrett, 211 F.3d at 1083.  Plaintiff has provided no basis for a willful violation and a two year statute of limitations is appropriate.

## H.    NO PRIVATE CAUSE OF ACTION FOR FLSA RECORD KEEPING VIOLATION.

Plaintiff alleges that Stratasys failed to accurately record and preserve records, and asks this Court to enter judgment against Stratasys for violating the FLSA in this regard. (Docket No. 1 ¶¶ 49, 51.)  The FLSA requires employers subject to the FLSA to "make, keep, and preserve such records of the persons employed" and to "preserve such records".  29 U.S.C. § 211(c).  However, the FLSA does not provide a private cause of action for violation of its recordkeeping provisions, only unpaid overtime or minimum wages.  29 U.S.C. § 216(b); see also Le v. Regency Corp., No. 13-391, __ F. Supp. 2d __, 2013 WL 3717754, *8 (D. Minn. July 15, 2013) (Frank, J.) (plaintiffs conceded the FLSA does not provide private cause of action for a recordkeeping violation).  Rather, the Secretary of Labor has the exclusive authority to enforce the recordkeeping provisions of 29 U.S.C. § 211(c).  29 U.S.C. §§ 215(a)(5), 217; see also LePage v. Blue Cross and Blue

34

<u>Shield of Minn.</u>, 2008 WL 2570815 (D. Minn.) (Kyle, J.).   Accordingly, Plaintiff's recordkeeping claim should be summarily dismissed.

### III.   CONCLUSION

Based upon the foregoing, Stratasys respectfully requests that the Court grant its Motion in its entirety.

Date: November 7, 2013

By:___ s/ Corie J. Tarara_____
Gregory L. Peters
Bar Number 0289401
Corie J. Tarara
Bar Number 0349197
**Attorneys for Defendant, Stratasys, Inc.**
SEATON, PETERS & REVNEW, P.A.
7300 Metro Boulevard, Suite 500
Minneapolis, MN 55439
Telephone: (952) 896-1700
Fax: (952) 896-1704
Email:  gpeters@seatonlaw.com
Email:  ctarara@seatonlaw.com